CLAIRE WOODS (SBN 282348)
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401
Telephone: (310) 434-2335
Fax: (415) 795-4799
E-mail: cwoods@nrdc.org

FRANCIS W. STURGES, JR. (IL No. 6336824)
*[Pro Hac Vice Admission Forthcoming]*
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 847-6807
Fax: (415) 795-4799
E-mail: fsturges@nrdc.org

*Counsel for Plaintiff Natural Resources Defense Council*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> Plaintiff, <br><br> v. <br><br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE, <br><br> Defendants. | Case No. 21-cv-561 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> (Endangered Species Act, Administrative Procedure Act) |

**INTRODUCTION**

1.      Plaintiff Natural Resources Defense Council (NRDC or "Plaintiff") challenges the United States Fish and Wildlife Service's (the "Service") decision to remove the gray wolf (*Canis lupus*) from the list of threatened and endangered species. Endangered and Threatened Wildlife and Plants; Removing the Gray Wolf (Canis lupus) From the List of Endangered and Threatened Wildlife," 85 Fed. Reg. 69,778 (Nov. 3, 2020) (the "Delisting Rule" or the "Rule").

2.      Gray wolves are an iconic species nearly extirpated in the United States through widespread predator control programs, and habitat and prey loss. Since the 1970s, slowly and with the protection of the Endangered Species Act (ESA), wolves have begun to recover. After repeated failed attempts to reduce or eliminate protections for wolves over the last twenty years, the Service's new Delisting Rule unlawfully removes protections for gray wolves across the United States based on their recovery in one area—the Great Lakes. This nationwide delisting would stop wolf recovery in its tracks, particularly in areas where wolves have only begun to regain their historical footing.

3.      According to the Service, there are about 4,200 wolves in the Great Lake states of Minnesota, Michigan, and Wisconsin. However, these states have only committed to maintaining half of that number (about 2,150).

4.      Gray wolves are present, but not yet recovered, in several other geographic areas, including the Pacific Coast, the Central Rockies, and other portions of the Midwest and the Northeast.

5.      There are only 54 wolves and seven established, breeding wolf pairs in the Pacific Coast region of California and the western portions of Washington and Oregon where wolves have been protected as endangered ("Pacific Coast wolves").

6.      Gray wolves have recently been identified in the Central Rockies (Utah, Colorado), including six wolves observed in 2020 in an established pack in Colorado ("Central Rockies wolves").

7.     There have been confirmed wolf sightings in portions of the Midwest (North Dakota, South Dakota), and further sightings in eleven more western, midwestern, and eastern states (Vermont, Massachusetts, New York, Indiana, Illinois, Iowa, Missouri, Nebraska, Kansas, Arizona, and Nevada).

8.     Gray wolves remain endangered throughout significant portions of their range. Delisting gray wolves prematurely will doom their nationwide recovery. Federal protections for wolves should remain in place until wolves have recovered in areas such as the Central Rockies, along the Pacific Coast, and the Northeast, where there is still significant suitable habitat but where wolf populations remain low.

9.     In promulgating the Rule, the Service violated the ESA and the Administrative Procedure Act (APA) by improperly relying on one or two core populations to delist gray wolves throughout the country, impermissibly treating the Pacific Coast wolf population as a mere remnant, departing from the Service's prior position without explanation, misapplying the key term "significant," failing to use the best available science in its analysis of a significant portion of wolves' range, failing to account for the impacts and causes of lost historical range, and failing to provide notice of its analysis in the Rule.

10.     For these reasons, the Rule violates section 4 of the ESA and its implementing regulations, *see* 16 U.S.C. § 1533; 50 C.F.R. pt. 402, and is arbitrary, capricious, an abuse of discretion, and contrary to law under the APA, *see* 5 U.S.C. § 551 *et seq.* It must be set aside.

## JURISDICTION AND VENUE

11.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 16 U.S.C. § 1540(g) (ESA citizen-suit provision), and 5 U.S.C. § 702 (judicial review of agency action).

12.     The relief requested may be granted under 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief), 16 U.S.C. § 1540(g) (ESA citizen-suit provision), and 5 U.S.C. §§ 701-706 (APA).

13.     Pursuant to section 11(g)(2) of the ESA, 16 U.S.C. § 1540(g)(2), NRDC provided the Department of the Interior, the Secretary of the Interior, the Service, and the Director of the Service with written notice of NRDC's intent to file this suit on November 23, 2020, more than sixty days prior to the commencement of this action. A copy of this notice letter is attached as Exhibit A.

14.     Defendants have not corrected their violations of law in response to NRDC's written notice.

15.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) and 16 U.S.C. § 1540(g)(3)(A) because a substantial portion of the events giving rise to NRDC's claims occurred in this District. At least one established pack of gray wolves impacted by the Rule resides in California, gray wolves are known to disperse to the state, this District has suitable habitat for gray wolves, and this District is a part of the historical range of gray wolves. The Service analyzed the status of gray wolves in California in the Rule, and the Rule will affect the state of California's management of gray wolves. NRDC also has an office and members in this District.

## INTRADISTRICT ASSIGNMENT

16.     This case is properly assigned to the San Francisco Division or the Oakland Division under Civil L.R. 3-2(c) because NRDC's office is located in San Francisco County.

## PARTIES

17.     Plaintiff NRDC is a national, nonprofit environmental membership organization whose purpose is to safeguard the Earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC was founded in 1970 and is organized under the laws of the State of New York. NRDC is headquartered in New York, NY, and maintains offices in other locations within the United States and abroad. NRDC has hundreds of thousands of members nationwide, including many in this judicial district. NRDC has long been active in efforts to protect endangered and threatened species generally and gray wolves specifically.

18.     NRDC members regularly observe, visit, study, work to protect, and delight in the presence of gray wolves in the wild. NRDC members intend to continue doing so in the future. NRDC members derive scientific, educational, recreational, conservation, aesthetic, and other benefits from the existence of gray wolves in the wild. These interests have been, are, and will be directly, adversely, and irreparably affected by Defendants' violation of the law. These are actual, concrete injuries, traceable to Defendants' conduct that would be redressed by the requested relief. Plaintiffs have no adequate remedy at law. NRDC members will continue to be prejudiced by Defendants' unlawful actions until and unless this Court provides the relief prayed for in this Complaint.

19.     NRDC member Ellyn Wiens lives in Duluth, Minnesota. She has been keenly interested in gray wolves ever since her grandparents introduced her to the outdoors and wildlife, and she has now passed that same sense of appreciation on to her own grandchildren. Wolves are her favorite wild animal, and it is important for her that they have room to roam and to thrive. Ms. Wiens has always wanted to see a wolf in the wild and hopes to see one from her own wooded home. She feels great excitement and joy about the possibility of seeing a gray wolf on or around her property in the future. Her neighbors in Minnesota have captured images of wolves on trail cameras, which gives her great hope that she will soon experience one on her property. She has seen evidence of wolves and learned more about them on visits to Isle Royale and Denali National Parks. She stays informed on the status of wolves locally through a wildlife biologist friend and has also enjoyed seeing wolves at zoos. Ms. Wiens has concerns about the negative impacts of delisting, including state management of wolves, genetic inbreeding of small wolf populations, and negative effects on wolf social dynamics.

20.     NRDC member Matt Wilkin is a retired federal employee who worked for the U.S. Forest Service and Bureau of Land Management who has been interested in wolves for decades. Mr. Wilkin lives in Minnesota and has a family farm in Michigan's Upper Peninsula. At his home in Minnesota, Mr. Wilkin has seen wolves and their tracks. This past fall, he even heard and recorded multiple wolves howling to each other. Mr.

Wilkin enjoys seeing wolves and is always looking for them and other wildlife. He notes that you don't soon forget when you've seen a wolf. Mr. Wilkin believes that science-based principles should be applied to ensure wolves are protected but worries that after federal delisting state-level wolf management policies will be relaxed because of influence by hunters. He worries that some people will even exceed limits on their hunting permits. He is concerned that this will drive wolves into remoter areas and will stop him from being able to continue to observe wolves from his home.

21.      NRDC member Diarmuid McGuire owns and operates the Green Springs Inn in southern Oregon. Mr. McGuire feels deep satisfaction and gratification knowing that wolves visit his property and frequent his neighbors' properties. Mr. McGuire feels an emotional connection to wolves and values the role they play as a keystone species. His business depends on visitors that come to the area because of its vibrant ecosystems. One major draw is the Cascade-Siskiyou National Monument, which was designated for the protection of biodiversity. Mr. McGuire's property is an inholding of the National Monument. Mr. McGuire cares about wolves as a tangible symbol that he can use to explain the abstract concept of biodiversity. He also loves wolves because of their active role as predators that manage the elk population to keep the ecosystem healthy. When a radio-collared wolf known as OR-7 was first tracked in the area about a decade ago, he threw a welcome home party complete with "Welcome to the Green Springs" buttons featuring a gray wolf. He did this to welcome gray wolves to the neighborhood, and to show the community's support for their presence there. Since then, he has seen and enjoyed, and continues to enjoy, the positive impacts that wolves have had on the local ecosystems. He hopes to see or hear gray wolves on his property in the future. He also kept informed of OR-7's movement into California and follows the multiple packs related to OR-7 on both sides of the state line. Mr. McGuire worries that wolves could lose state protections in the wake of federal delisting. He is concerned that the small number of wolves in the area will be vulnerable after delisting and that they would be unable to

withstand hunting. He is worried that the loss of those wolves will reverse the positive ecological benefits he has observed since their return to the landscape.

22.     NRDC member Gonzalo Rodriguez lives in San Francisco and is employed by NRDC. Mr. Rodriguez has always been a nature and wildlife enthusiast. He first became interested in gray wolves as a symbol of America after moving to this country while growing up. His awareness of the species and the threats facing them increased when he moved to the West Coast. Last year, Mr. Rodriguez saw wolves in the wild on a trip to Yellowstone National Park. He went to the park with his fiancée with the hopes of seeing wolves from a distance, but they had the good luck to spot the pitch-black alpha male wolf from the Wapiti Lake Pack from only a few hundred yards away. More members of the pack emerged as they watched, and Mr. Rodriguez was able to record video of more than a dozen of the wolves howling. He also derived great pleasure in watching them feed on a carcass and move through the snow into the forest line. Mr. Rodriguez found the experience of watching wolves in the wild to be incredible and unique. He also cherishes the fact that he was able to observe up close a pack that is known to be reclusive. On that same trip, Mr. Rodriguez observed other packs, and he plans to return to Yellowstone again with family in December 2021 to share the experience of seeing wolves with them. Mr. Rodriguez also keeps informed about wolves in California, and has been, and continues to be, particularly interested in learning about lone wolves returning to the state. He feels great joy in learning about California's wolves and plans this spring or summer, when conditions permit, to travel to the Lassen Pack's territory in Northern California in order to see them and the effects they have on that ecosystem. Mr. Rodriguez cares about and has experienced, and plans to continue to recreate in, the coastal regions of California. Because of his passion for observing wolves in the wild, Mr. Rodriguez hopes to see wolves return to those areas and looks forward to traveling there for the purpose of experiencing wolves in his home state, if they return to that area. In addition to recreational interests, Mr. Rodriguez feels a spiritual value in just knowing that wolves are returning to their historical ecosystems and derives joy from that

even beyond seeing them. He is thankful that the ESA has helped wolves make a comeback in some parts of the country. However, he is concerned that their numbers are not what they need to be and that they remain absent from important areas of their range. He worries that after delisting more people will shoot wolves, including ranchers trying to protect livestock, people with an unfounded fear of wolves, or people that merely want to shoot wolves for sport. Because of the small number of wolves, Mr. Rodriguez worries that he would then lose the chance to see wolves again or to be able to share that experience with family in the future.

23.     Defendant Department of the Interior ("Interior") is an agency of the United States Government and includes Defendant the Service. Among other functions, Interior is responsible for the administration and implementation of the ESA for terrestrial animal species and is legally responsible for listing decisions for species such as the gray wolf.

24.     Defendant Fish and Wildlife Service is an agency of the United States Government, within and under the jurisdiction of the Department of the Interior. Through delegation of authority by the Secretary of the Interior ("Secretary"), the Service administers and implements the ESA as it relates to terrestrial animal species and is legally responsible for listing decisions for species such as the gray wolf.

**BACKGROUND**

## I.    THE ENDANGERED SPECIES ACT PROTECTS PLANTS AND ANIMALS AT RISK OF EXTINCTION

25.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978). As the Supreme Court has recognized, "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*, 515 U.S. 687, 699 (1995) (quoting *Hill*, 437 U.S. at 184).

26.     The law's "purposes . . . are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3).

27.     To implement these purposes, the ESA directs that the "Secretary shall . . . determine whether any species is an endangered or threatened species." 16 U.S.C. § 1533(a)(1). This determination must be made on the basis of five factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

*Id.* The ESA "requires the [Service] to consider *each* of the [five] factors 'to determine whether any species is an endangered species or threatened species.'" *Crow Indian Tribe v. United States*, 965 F.3d 662, 671 (9th Cir. 2020) (quoting 16 U.S.C. § 1533(a)(1)) (emphasis added).

28.     The Service must use the best available science to support this determination. 16 U.S.C. § 1533(b)(1)(A). The best available science requirement applies both to listing and to delisting decisions.

29.     The listing determination can only be done for "species." The ESA defines "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

30.     Designation of a distinct population segment allows portions of a species that are sufficiently significant and discrete to be considered independently for purposes

of their listing status. *See* 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996) ("Distinct Population Segment Policy"). Under the Service's Distinct Population Segment Policy, a population segment may be considered "discrete" if it "is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors." *Id.*

31.     An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

32.     A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

33.     The Service defines "range" for the purpose of interpreting the statutory definitions of threatened as endangered species as "the general geographical area within which the species is currently found, including those areas used throughout all or part of the species' life cycle, *even if not used on a regular basis*." 79 Fed. Reg. 37,578, 37,609 (July 1, 2014) ("Significant Portion of Its Range Policy") (emphasis added); *see Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (affirming definition).

34.     The Service must also consider the effects from the loss of a species' historical range when determining the species' status. The Service's Significant Portion of Its Range Policy "is explicit that a species may be 'endangered or threatened throughout all or a significant portion of its current range *because* [a] loss of historical range is so substantial that it undermines the viability of the species as it exists today.'" *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017) (quoting 79 Fed. Reg. at 37,584) (emphasis added and alteration in original). This policy, therefore, "requires that [the Service] consider the historical range of a species in evaluating other aspects of the agency's listing decision, including habitat degradation." *Ctr. for Biological Diversity*, 900 F.3d at 1067 (citing *Humane Soc'y*, 965 F.3d at 605-06).

35.     Once a species is listed under the ESA, it receives a number of protections. These include a prohibition on the "take" of any such species, 16 U.S.C. § 1538(a)(1)(B),

and a requirement that each federal agency "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species," *id.* § 1536(a)(2). The Service also "shall develop and implement [recovery plans] for the conservation and survival of endangered species and threatened species." *Id.* § 1533(f)(1).

## II.    THE GRAY WOLF IS A KEYSTONE SPECIES RECOVERING ONLY WITH THE HELP OF FEDERAL PROTECTION

36.    The gray wolf (*Canis lupus*) is the largest wild member of the dog family, with individual adult wolves weighing as much as 175 pounds.

37.    Gray wolves are social animals that hunt in packs that can have as many as 20 or more wolves. Wolf pack territories can range in size up to 1,000 square miles.

38.    Gray wolves are a keystone species, which means that their presence or absence in a landscape has a top-down effect on the structure and function of entire ecosystems. There is scientific evidence, for instance, that the reintroduction of gray wolves to Yellowstone National Park impacted the populations of elk, beaver, bison, aspen, cottonwoods, and willows.

39.    Considerable genetic variations exist between populations of gray wolves due to adaptations to different environments. The scientific term for a population of a species with differences in appearance, behavior, and habitat is "ecotype." Fish & Wildlife Serv., Gray Wolf Biological Report 4 (2020) (the "Gray Wolf Biological Report" or "Biological Report").

40.    For instance, gray wolves of the Great Lakes ecotype are smaller, adapted to mixed-deciduous forests, and primarily prey on white-tailed deer, while gray wolves in a different ecotype found in the Rocky Mountains are adapted to montane forests and prey on larger mammals such as mule deer, elk, and moose.

41.    There is also a "coastal ecotype" that is "genetically and morphologically distinct, and display[s] distinct habitat and prey preferences, despite relatively close proximity" to other wolves. *Id.*

42.     The coastal rainforests of the Pacific Northwest are the suitable habitat for coastal wolves, as opposed to the drier interior landscape favored by inland wolves.

43.     Recent genomic studies identified coastal ecotype wolves in Washington and found that Washington and Oregon have distinct suitable habitats for both coastal and inland wolves.

44.     There are at least two packs of gray wolves, the Teanaway and Rogue packs, with territories currently located primarily in habitat that has been found to be mostly suitable for the coastal ecotype. Other wolves in the Pacific Coast may share ancestry with these packs, including wolves in California descended from the Rogue pack in Oregon.

45.     "Having robust populations of these different ecotypes improves the species' ability to adapt to changing environmental conditions over time and to recolonize a variety of suitable habitats." *Id.* at 29.

### A.     GRAY WOLVES WERE NEARLY DRIVEN EXTINCT IN THE LOWER 48 BY PREDATOR CONTROL PROGRAMS

46.     Gray wolves were once numerous across North America. Prior to European settlement, there were hundreds of thousands of gray wolves in the West and thousands more could be found throughout the Great Lakes and the Northeast.

47.     Despite this historical abundance, gray wolves were driven almost to extinction in the lower 48 through government-sponsored predator control programs, unregulated hunting and trapping, and other human-caused mortalities. The federal and state government played an active role in encouraging and carrying out these extermination efforts, going as far back as the first congressionally passed bounty program for wolves in 1817.

48.     These eradication campaigns were relentlessly successful. By the 1930s, wolves had been eliminated throughout the West. The only significant population of wolves in the lower 48 by the middle of the twentieth century consisted of a thousand wolves or less in the Great Lakes.

49.     Gray wolves were also eliminated from almost all of their historical range due to this eradication program. Although the historical range for gray wolves covered most of the lower 48, at the time of nationwide gray wolf listing under the ESA, the species' range was limited to Northern Minnesota and Isle Royale National Park in Michigan. This map from the Gray Wolf Biological Report shows how the Service estimates the gray wolf's historical range.[1]



Historical range[1]

Historical range, exact boundary uncertain[2]

Approximate range at the time of listing (1978)

Current range[3]

Current range of the Mexican wolf subspecies (*Canis lupus baileyi*)[4]

[1] Based on Nowak (1995)
[2] Based on the distribution of *Canis lupus lycaon* identified in Nowak (1995)
[3] Based on state data
[4] U.S. portion of current range only

50.     The Service separately protects Mexican wolves (*Canis lupus baileyi*) as an endangered subspecies. 85 Fed. Reg. at 69,780; 50 C.F.R. § 17.11(h). Red wolves (*Canis rufus*) are recognized as a distinct species and are also protected as an endangered species. 85 Fed. Reg. at 69,786; 50 C.F.R. § 17.11(h).

---

[1] Plaintiff disputes the illustration of current range on this map. *See infra* ¶ 132.

**B.    THE ESA HAS FACILITATED PROGRESS ON GRAY WOLF RECOVERY**

51.    Gray wolves were among the first species protected under federal endangered species legislation in the 1960s. Wolves in the eastern United States first received federal protection under a precursor to the ESA in 1967 when they were listed under "Timber Wolf — *Canis lupus lycaon*." 32 Fed. Reg. 4001, 4001 (Mar. 11, 1967). In 1973, protections under that same law were extended to wolves in the Northern Rockies under "Northern Rocky Mountain wolf — *Canis lupus irremotus*." 38 Fed. Reg. 14,678, 14,678 (June 4, 1973). Both of those entities were then protected under the ESA shortly after its passage. 39 Fed. Reg. 1158, 1175 (Jan. 4, 1974).

52.    In 1978, the Service shifted its approach to how gray wolves were listed under the ESA. The Service "recognize[d] that the entire species *Canis lupus* is Endangered or Threatened to the south of Canada," and as a result determined that protecting gray wolves would "be handled most conveniently by listing only the species name." 43 Fed. Reg. 9607, 9607 (Mar. 9, 1978). To implement this approach, the Service issued a rulemaking where the gray wolf "group in Mexico and the 48 conterminous States of the United States, other than Minnesota, [was] considered as one 'species', and the gray wolf group in Minnesota [was] considered as another 'species'." *Id.* at 9610. Using these two groupings, the Service listed the gray wolf as threatened in Minnesota and endangered throughout the "48 conterminous states, other than Minnesota." *Id.* at 9612.

53.    Although the 1978 listing was done to protect the "entire species" nationally, *id.* at 9607, the Service subsequently developed recovery plans for gray wolves only at the regional level. The Service developed a recovery plan for the "Eastern Timber Wolf" in 1978 and revised that plan in 1992. The Service developed a recovery plan for Northern Rockies wolves in 1980 and revised that plan in 1987. The third regional recovery plan was for the Southwest in the area where wolves are now separately listed as the Mexican wolf subspecies. Despite repeated requests, the Service has never developed a national recovery plan for the gray wolf.

54.     Currently, the Service estimates there are over 6,000 gray wolves in the lower 48. Of these, approximately 4,200 wolves are in the Great Lakes, roughly 54 are in the Pacific Coast, and is one pack in the Central Rockies, which had six wolves in 2020. Compared to the low point of wolves before listing under the ESA, these numbers indicate an increase in the population of the species. These gains demonstrate how the ESA's protections can facilitate progress toward species recovery. But progress toward recovery is not the same as recovery. The current population of gray wolves continues to be no more than a tiny fraction of the historical number of gray wolves, and the species has only recently begun to make tenuous returns to and remains particularly vulnerable in many regions, including the Pacific Coast and Central Rockies.

## C.     THE SERVICE HAS REPEATEDLY AND UNSUCCESSFULLY SOUGHT TO REMOVE ESA PROTECTIONS FOR GRAY WOLVES

55.     Over the last two decades, the Service has made several attempts to delist gray wolves.

56.     The Service's attempts to delist gray wolves have largely failed in the courts. *See Defs. of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005) (vacating 2003 rule splitting gray wolves into four groups); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 568 (D. Vt. 2005) (vacating 2003 rule splitting gray wolves into four groups); *Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) (vacating 2007 rule delisting Western Great Lakes distinct population segment); *Defs. of Wildlife v. Hall*, 565 F. Supp. 2d 1160, 1178 (D. Mont. 2008) (issuing preliminary injunction against 2008 delisting of Northern Rocky Mountains distinct population segment); *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1228 (D. Mont. 2010) (vacating 2010 rule delisting gray wolves in the Northern Rockies except for Wyoming); *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 615 (D.C. Cir. 2017) (upholding vacatur of 2011 delisting of Western Great Lakes distinct population segment).

57.     In 2011, Congress passed an appropriations bill rider directing the Service to reissue a rule to delist Northern Rockies wolves that a district court had previously

vacated and precluding initial judicial review of the new rule, and the Ninth Circuit upheld this provision. *See All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1172, 1175 (9th Cir. 2012). The Service later delisted gray wolves in Wyoming, and the Court of Appeals for the D.C. Circuit reversed a district court ruling vacating that rule. *See Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1093 (D.C. Cir. 2017).

58.     In 2013, the Service also proposed the delisting of all gray wolves in the lower 48 outside of the two regions where they were then unprotected. *See* 78 Fed. Reg. 35,664, 35,664 (June 13, 2013). The Service proposed to delist these wolves on the grounds that the then "currently listed *C. lupus* entity does not represent a valid listable entity under the" ESA. *Id.* at 35,718. This rule was never finalized.

59.     Following these agency rules, congressional appropriations rider, and court rulings, gray wolves were protected as threatened in Minnesota, protected as the subspecies Mexican wolves in the Southwest, not protected in the Northern Rockies, and protected elsewhere in the lower 48 as endangered, as shown in the map below.



85 Fed. Reg. at 69,782.

## III.  DELISTING GRAY WOLVES WILL IMPAIR SPECIES RECOVERY

60.     The Service proposed delisting gray wolves on March 15, 2019. *See* 84 Fed. Reg. 9648 (Mar. 15, 2019) ("Proposed Rule"). In the Proposed Rule, the Service lumped wolves in Minnesota and the lower 48 into what it called the "gray wolf entity" for purposes of delisting. *Id.* at 9656. The Service used this arbitrarily combined "gray wolf entity" to claim that gray wolves can be delisted across the country because of recovery solely in the Great Lakes. *Id.* at 9683. NRDC submitted comments on July 15, 2019, noting that combining disparate wolf populations for purposes of analysis is illogical and impermissible, arguing that wolves remain endangered throughout a significant portion of their range, and urging the Service to instead develop a national wolf recovery plan to set recovery goals for wolves throughout the United States.

61.     The Service then issued the Rule delisting wolves on November 3, 2020, claiming that because wolves in the Great Lakes region have met certain recovery goals, wolves across the country, including in the Pacific Coast and Central Rockies, can also be delisted because they are not necessary for the Great Lakes population to survive. *See* 85 Fed. Reg. at 69,886 (concluding wolves outside the Great Lakes are "not necessary for the recovered status of the combined listed entity"); *see also id.* at 69,893 (similar conclusion for wolves outside the Great Lakes and Northern Rockies for the "lower 48 United States entity").

62.     The Rule analyzes wolves in three different "configurations" for purposes of delisting: (1) the threatened Minnesota and the endangered "44-state entity," separately; (2) a "combined listed entity" that lumps endangered and threatened areas together; and (3) a "lower 48 United States entity" that lumps endangered and threatened areas with the congressionally delisted Northern Rockies population. 85 Fed. Reg. at 69,784-85. The first "configuration" consists of two different entities, resulting in a total of four analyzed "entities." *See id.* at 69,784-85. The Proposed Rule only considered the "combined listed

entity," which the Service had then termed the "gray wolf entity." *See* 84 Fed. Reg. at 9655-56.

63.     According to the Service, this novel triple-configuration analysis is "a conservative approach to delisting." *Id.* at 69,784. "Rather than focus on gray wolf [distinct population segments] and taxonomic units"—as required by section 4 of the ESA—the Service "focus[ed] on the currently listed entities." *Id.*

64.     The Service uses the arbitrarily defined "combined listed entity" and "lower 48 United States entity" to support its contention that gray wolves can be delisted across the country solely because of their status in three regions: the Eastern United States, where wolves are recovering in the Great Lakes; the Northern Rockies, where gray wolves were delisted by Congress and not because of recovery; and the Southwestern United States, where Mexican wolves are separately listed as an endangered subspecies.

65.     This three-region approach is based on three outdated recovery plans originally developed between 1978 and 1982. The Service declares in the Rule that it has "consistently focused on three areas" for recovery. *Id.* at 69,855. However, the Proposed Rule did not include that justification and the Service never claims that an exclusive focus on those three areas is justified by the best available science, as required by the ESA. Indeed, the Service has previously considered additional areas for wolf recovery, including specifically the Pacific Coast region.

66.     For the first region, the Service declares that "the Great Lakes area" by itself "contains sufficient wolf numbers and distribution to ensure the long-term survival of gray wolves in the Eastern United States." *Id.* at 69,791. The Service relies solely on the outdated 1992 Eastern Timber Wolf Recovery Plan to support this contention.

67.     When considering the status of wolves in the Eastern United States, the Service failed to consider the potential for wolves to reestablish in the Northeast. *See id.* at 69,785-86 (describing scientific status of wolves in Northeast as "unresolved"). The District of Vermont vacated a previous delisting rule for similarly combining wolves in the Midwest and Northeast. *See Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 564-65.

68.     After delisting, however, gray wolves face new threats from human-caused mortality in the states in the Great Lakes region.

69.     Under Wisconsin law, the state Department of Natural Resources (DNR) is *required* to hold a wolf hunt starting on the first day of November and running until the last day of February if wolves are delisted under federal and state endangered species laws. *See* Wi. Stat. § 29.185(1m), (5) (commonly known as "Act 169").

70.     Under Minnesota law, if wolves are delisted, the state DNR "may prescribe open seasons and restrictions for taking wolves but must provide opportunity for public comment." Minn. Stat. § 97B.645 subd. 9. The Minnesota DNR is currently updating its wolf management plan, making any future protections or management actions in that state uncertain. The Minnesota DNR also submitted a comment expressing concerns about the nationwide status of gray wolves. *See* 85 Fed. Reg. at 69,861 ("The Minnesota Department of Natural Resources stated that a blanket delisting of gray wolves across the United States may not be warranted.").

71.     Michigan, another state that the Service relies on for the continued viability of wolves in the Great Lakes, submitted a comment opposing the delisting rule as unlawful. *See id.* at 69,860-61 (Michigan Attorney General objecting to the Service's "significant portion of its range" analysis and noting the Service's threats analysis did not fully cover the wolves' current range).

72.     The last time the Service delisted gray wolves in the Great Lakes in 2011, Minnesota and Wisconsin each held three hunting seasons and Michigan held one hunting season. Over 1,400 wolves were killed during these hunts. A court restored ESA protections for these wolves in 2014.

73.     For the second region, the Service states that wolves in the Northern Rockies "have recovered and were delisted." *Id.* at 69,792. This statement is incorrect. These wolves were delisted *not* because they were recovered, but rather because of a congressional appropriations bill that precluded initial judicial review. *See All. for the Wild Rockies*, 672 F.3d at 1172. Before this congressional intervention, a district court held that the Service's

attempt to delist these wolves was "unlawful for failing to list and protect the entire" distinct population segment and vacated the delisting. *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d at 1228. The current number of Northern Rockies wolves is unclear because Idaho and Montana are no longer required to conduct post-delisting monitoring. *See* 85 Fed. Reg. at 69,788.

74.     The third region relies on a continued endangered listing of the Mexican wolf as a subspecies, and the Service does not analyze this region in the Rule. *See id.* at 69,791.

75.     The Service failed to analyze the status of gray wolves in other regions in their current range, including in the Pacific Coast and Central Rockies.

76.     The Service failed to analyze wolves in the Pacific Coast. Prior to the Rule, the ESA protected gray wolves in California and the western portions of Oregon and Washington as endangered, and there are at least 54 wolves in this area. These wolves have moved up and down the coast reestablishing territory, relying on dispersal to gain a footing in new areas. Many of the Pacific Coast wolves are of the distinct and discrete coastal ecotype with differences in genetics, size, appearance, habitat, and prey selection from inland wolves.

77.     The first wolf pack with pups in Washington since the 1930s was confirmed in July 2008. There are now 26 known wolf packs in the state, with five packs in the western portion of the state where wolves had until the Rule been protected by the ESA.

78.     The first modern count to document gray wolves in Oregon found 14 in 2009. There are now approximately 158. The 2019 wolf count found only 17 known wolves in 3 packs in the western portion of the state where wolves had until the Rule been protected by the ESA. One of these packs is the Rogue Pack, which was first recognized as a new pack in the Cascade Mountains in 2014. This area is a suitable habitat for the gray wolf coastal ecotype. The dominant male that established the pack, OR-7, is believed to have died in 2020.

79.     That same wolf, OR-7, was also the first wolf since the 1920s to be documented in California when it crossed over into the state from Oregon in 2011. The Shasta Pack was then identified as the first known breeding pack in California in 2015, and was descended from coastal Oregon wolves. That pack had only a tenuous foothold, and it disappeared by the next year. There is now a new pack in California, the Lassen Pack, with documented pups in every year since 2017. This pack has a range of roughly 500 square miles and had a minimum of 17 wolves as of last summer. Wolves also disperse significant distances across California. For instance, researchers used radio-collar data to track a daughter of OR-7 known as OR-54 for 8,712 miles as she moved from Oregon, throughout California, and even into Nevada before she died last year.

80.     Coastal wolves improve the genetic diversity of gray wolves by contributing evolutionary uniqueness and adaptive potential. Coastal wolves also can have top-down effects on ecosystems, regulating the abundance and health of other species in their distinct environments.

81.     The Service also failed to analyze the status of Central Rockies wolves despite the recent reestablishment of at least one wolfpack, an upcoming state-led reintroduction plan, and suitable habitat in that region.

82.     Even more recently than along the Pacific Coast, gray wolves have begun to reestablish territory in the Central Rockies. The first wolf pack in Colorado in over 70 years was spotted in 2019 and confirmed last year with at least six wolves. The origin of these wolves has yet to be determined. Although the pack has persisted for at least a year, DNA samples show that the adult wolves are likely siblings or closely related. This lack of genetic diversity creates a risk of inbreeding for this pack.

83.     Colorado voters also approved a ballot initiative in fall 2020 to reintroduce wolves to the western slope of the Rockies. To implement this ballot initiative, the Colorado Department of Parks and Wildlife will develop a plan to reintroduce wolves by the end of 2023.

Complaint for Declaratory and Injunctive Relief

84.     There are no established wolves in Utah because under state law, the state would "request immediate removal" of any wolf in a part of the state where they were protected as endangered and managed wolves to "prevent the establishment of a viable pack in all areas of the state where the wolf is not listed as threatened or endangered." Utah Code § 23-29-201.

85.     Gray wolves would face other new threats after delisting. States and tribes have been limited in their ability to use lethal methods to control wolves that attack livestock where the gray wolf is listed as endangered. After delisting, though, this practice is likely to increase.

86.     Gray wolves will also face potential threats to their genetic diversity. Currently, dispersing wolves play a role in reducing genetic threats such as from inbreeding. The ESA's protections create habitat connectivity for gray wolves, allowing wolves to move from one area of suitable habitat to another. Delisting gray wolves will reduce habitat connectivity and therefore decrease the ability of wolves to disperse. Despite this decrease in connectivity and the resulting reduction in dispersal rates, the Service still relies on wolf dispersal to minimize genetic threats to wolves.

87.     Another threat to gray wolf packs after losing ESA protections is the negative effect of the loss of individual wolves, particularly if the loss is one of a pack's breeding pair, on wolf social structure.  This impact can extend beyond an individual pack by reducing dispersal, recruitment, or even population growth. These effects are often magnified for wolves in packs in recently reestablished territory. The wolfpacks in California and the Central Rockies have only become established in the last few years.

88.     On January 20, 2021, the Rule was included on a list of agency actions to be reviewed under the Executive Order titled "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis." The Rule has not been rescinded, and Interior and the Service have yet to take any other actions as part of this review.

89.     Relying on purported recovery in the Great Lakes and in the Northern Rockies, the Service extrapolates without providing a scientific rationale to declare wolves

recovered nationally. At no point does the Rule address recovery of wolves in the Pacific Coast, the Central Rockies, or any other part of their range.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violation of Endangered Species Act—
### Unlawful Analysis of Non-ESA Eligible Entities)

90. Plaintiff hereby realleges and incorporates Paragraphs 1 through 89.

91. The ESA defines endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range" and threatened species as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). The ESA then defines "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

92. Despite this statutory framework, the Rule analyzes wolves as four different "entities" in three different "configurations" for purposes of delisting. 85 Fed. Reg. at 69,784-85. This approach violates the ESA's mandate that a delisting analysis must be of a species, subspecies, or distinct population segment. *See* 16 U.S.C. §§ 1532(16), 1533(a)(1), (c)(2). The four different entities presented in three configurations are none of these.

93. By analyzing the status of entities other than ESA-eligible units, the Service arbitrarily "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

94. To justify combining the Minnesota and 44-state entities, the Service claims that the two entities are not "discrete." *See* 85 Fed. Reg. at 69,784-85. This is wrong: although Minnesota wolves may not be discrete from wolves in Michigan and Wisconsin, they are discrete from wolves on the Pacific Coast. *See, e.g., id.* at 69,784 (describing Pacific Coast wolves as descending from Northern Rockies and Canadian wolves). Recent

genomic studies found that Pacific Coast wolves are distinct, and independent peer reviewers explained these studies to the Service.

95.     The Service's justification thus "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

96.     Courts have previously rejected rules where the Service only analyzed the status of wolves in "core areas" of wolf population while lumping together or ignoring surrounding low-population areas. *See Defs. of Wildlife*, 354 F. Supp. 2d at 1172 (finding the Service applied the Distinct Population Segment Policy in a manner that was "inconsistent with the statute" (quoting *Mines v. Sullivan*, 981 F.2d 1068, 1070 (9th Cir. 1992))); *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 565 (same).

97.     The Service takes the same error to the extreme here: it lumps together core populations of Great Lakes and Northern Rockies wolves with wolves in low-population areas across the lower 48 to form and delist the "lower 48 United States entity," 85 Fed. Reg. at 69,893.

98.     Therefore, the Rule is arbitrary, capricious, and not in accordance with law and should be set aside under the ESA and the APA. 16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

### (Violation of Endangered Species Act—
### Failure to Analyze Status of Pacific Coast Wolves)

99.     Plaintiff hereby realleges and incorporates Paragraphs 1 through 98.

100.    The Rule claims that Pacific Coast wolves are simply an extension of the Northern Rockies distinct population segment, denigrating Pacific Coast wolves as mere "colonizing wolves" whose small numbers make their presence unnecessary for wolf recovery in the "lower 48 United States." *See* 85 Fed. Reg. at 69,789, 69,886.

101.    The Service earlier determined that Northern Rockies wolves were discrete from Pacific Coast wolves, *see* 73 Fed. Reg. 10,514, 10,518-19 (Feb. 27, 2008); 74 Fed. Reg.

15,123, 15,128-29 (Apr. 2, 2009), to justify creating the Northern Rockies distinct population segment that excludes Pacific Coast wolves.

102.    Now, the agency claims that Pacific Coast wolves "are *not* discrete from wolves in the delisted [Northern Rockies] portion of the gray wolf taxon," 85 Fed. Reg. at 69,783-84 (citing 78 Fed. Reg. at 35,707-13) (emphasis added), and therefore they *cannot* constitute a distinct population segment that would warrant protection.

103.    That the Service changed its policy position without providing "a reasoned explanation . . . for disregarding facts and circumstances that underlay . . . the prior policy" is arbitrary and capricious. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

104.    The Service's decision to graft Pacific Coast wolves onto an already delisted segment violates the law by committing the same fault the D.C. Circuit described in *Humane Society of the U.S. v. Zinke*—creating a distinct population segment in order to delist one group, leaving out less populated surrounding areas, and then attempting to delist the "remnant" population. 865 F.3d at 601-03. The Pacific Coast wolves must not be treated as "a leftover group that becomes an orphan to the law," *id.* at 603, because of the agency's earlier Northern Rockies distinct population segment designation. "Such a statutory dodge is the essence of arbitrary-and-capricious and ill-reasoned agency action." *Id.*

105.    Therefore, the Rule is arbitrary, capricious, and not in accordance with law and should be set aside under the ESA and the APA. 16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF

### (Violation of Endangered Species Act— Failure to Consider Species Status Through a Significant Portion of Its Range)

106.    Plaintiff hereby realleges and incorporates Paragraphs 1 through 105.

107.    The Service failed to analyze whether the gray wolf is endangered or threatened throughout a "significant portion of its range," as required by the ESA. 16 U.S.C. § 1532(6), (20). The Rule states that the Service

> assessed 'significance' based on whether *portions of the range contribute meaningfully to the resiliency, redundancy, or representation of the gray wolf entity being evaluated* without prescribing a specific 'threshold.' This approach is substantively different from the way we defined 'significance' in our [Significant Portion of Its Range Policy] and, therefore, different from the approach evaluated and overturned by the courts.

85 Fed. Reg. at 69,854 (emphasis added).

108.    Using that definition, the Service determined that Pacific Coast and Central Rockies wolves "may be at greater risk from human-caused mortality or from factors related to small numbers of individuals. However, wolves in these portions are not meaningful to the redundancy or resiliency of the 44-State entity because they occur in small numbers and include relatively few breeding pairs." *Id.* at 69,885; *see also id.* at 69,889 (same conclusion for "combined listed entity"); *id.* at 69,892-93 (similar conclusion for "lower 48 United States entity"). The Service does not consider any other areas where gray wolves are listed, including where wolves have been repeatedly sighted, to determine whether these areas may constitute a "significant portion of its range."

109.    The Rule's conclusions about Central Rockies wolves also lack a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted).

110.    There are currently wolves in Colorado, including an established wolfpack.

111.    The Service acknowledged in the Rule that "[a]dditional populations of wolves in Colorado *would add to the resiliency and redundancy* of gray wolves in the lower 48 United States." 85 Fed. Reg. at 69,866 (emphasis added). Yet the Service still concluded Central Rockies wolves are "not meaningful to resiliency or redundancy because they contain few wolves, or few or no breeding pairs." *Id.* at 69,892.

112.    By this circular logic, the Service acknowledges that a larger population of wolves in the Central Rockies where there is suitable habitat for a significant number of

wolves would add to the wolves' resiliency and redundancy; however, because wolves have not yet recovered enough in that habitat, the agency entirely ignores these wolves for purposes of the ESA threats analysis. And one reason that wolves are not recovering in the Central Rockies is that Utah is actively preventing it, showing an "inadequacy of existing regulatory mechanisms" in that state. 16 U.S.C. § 1533(a)(1)(D).

113.    Removing ESA protections for Central Rockies wolves before they can occupy this suitable habitat and contribute to the resiliency and redundancy of the species, and in turn its likelihood of survival, is an impediment to species recovery.

114.    Therefore, the Rule is arbitrary, capricious, and not in accordance with law and should be set aside under the ESA and the APA. 16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF

### (Violation of Endangered Species Act— Failure to Comply with Significant Portion of Its Range Policy)

115.    Plaintiff hereby realleges and incorporates Paragraphs 1 through 114.

116.    The Rule impermissibly applies the term "significant portion of its range" to require a threat to wolves' viability throughout each of the four defined entities. *See* 85 Fed. Reg. at 69,881 (Minnesota entity); *id.* at 69,884 (44-state entity); *id.* at 69,888 (combined listed entity); *id.* at 69,892 (lower 48 United States entity).

117.    This decision violates the ESA's requirement to determine whether a species is endangered throughout all *or a significant portion* of its range. Without considering this question, the agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

118.    The Service has failed to give meaning to both "all of its range" and "a significant portion of its range." Caselaw requires both. The "significant portion of its range" language is rendered "illusory" where the Service requires the "significant portion" to be "so important that, without the members in *that* portion, the species would be endangered or threatened throughout *all* of its range." *Desert Survivors v. U.S. Dep't of*

*the Interior*, 321 F. Supp. 3d 1011, 1072-73 (N.D. Cal. 2018) (emphasis added) (quoting *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 956 (D. Ariz. 2017)); *see also Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141-42 (9th Cir. 2001) (noting that in "reading 'all' and 'a significant portion of its range' as functional equivalents," the agency made an "unacceptable" error in its statutory construction by rendering a significant statutory phrase redundant).

119.     In the Rule, the Service has once again interpreted "significant" in a way that renders consideration of endangerment throughout a "significant portion of its range" illusory. The Service finds that while wolves outside of the Great Lakes and Northern Rockies populations may be threatened by human-caused mortality, the populations outside these regions are not "significant." But in each of the portions the Service analyzes, including the Pacific Coast, Central Rockies, and Northeast, the agency determines that the wolf populations are not significant *because* they do not add "resiliency, redundancy, or representation" to the whole of each entity the Service defined and analyzed in the Rule—i.e., they are not necessary for the species' viability. Putting aside the lack of scientific basis for those claims, this interpretation fails to give meaning to both sides of the "or" by defining a portion's significance in terms of the entire entity's viability. Such an interpretation renders the phrase "significant portion of its range" superfluous and is thus arbitrary.

120.     Therefore, the Rule is arbitrary, capricious, and not in accordance with law and should be set aside under the ESA and the APA. 16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706(2).

### FIFTH CLAIM FOR RELIEF

### (Violation of Endangered Species Act— Failure to Use Best Available Science in Range Analysis)

121.     Plaintiff hereby realleges and incorporates Paragraphs 1 through 120.

122.     The Rule's conclusion that Pacific Coast wolves are "not biologically 'significant'" and are not "significant to the combined listed entity in terms of its

resiliency, redundancy, or representation," 85 Fed. Reg. at 69,889, is unsupported by the best available science. Where the Service reaches a "conclusion" to delist a species "without scientific basis, this conclusion is arbitrary and capricious." *Crow Indian Tribe*, 965 F.3d at 679 (ruling the Service failed to use best available science for Yellowstone grizzly bear delisting).

123.    Here, the Service's conclusion conflicts with its own finding in the 2020 Gray Wolf Biological Report that there are wolves of a "coastal ecotype" that are "genetically and morphologically distinct, and display distinct habitat and prey preferences" from inland wolves, like those in the Northern Rockies, "despite relatively close proximity." Gray Wolf Biological Report at 4-5. It also departs from the Service's 2008 finding that Pacific Coast wolves are discrete. 73 Fed. Reg. at 10,519.

124.    The best available science, including recent genomic studies that scientific peer reviewers identified and explained to the Service, shows that there are predominately coastal ecotype wolves and distinct suitable habitat for those wolves in the Pacific Coast.

125.    The Service "cannot ignore available biological information," *Ctr. for Biological Diversity*, 900 F.3d at 1060 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)), and its decision lacks a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (quotation marks omitted).

126.    Another reason the Service gives for why Pacific Coast wolves are not discrete from Northern Rockies wolves is that "there is little separation between occupied wolf habitat in the" Northern Rockies "and suitable habitat in western Washington, western Oregon, and northern California." 85 Fed. Reg. at 69,784. But in the Biological Report, the Service found that "[f]actors such as habitat type and prey specialization have been shown to influence genetic structuring, leading to measurable differentiation *even between areas with no physical barriers to dispersal*." Gray Wolf Biological Report at 4 (emphasis added). Genetic differences are "driven more strongly by climate and ecological factors" than by "isolation by distance." *Id.* The Pacific Coast has a distinct climate and ecology from interior areas of the West.

127.     The Service's Discrete Population Segment Policy defines discreteness by "physical, physiological, ecological, *or* behavioral factors." 61 Fed. Reg. at 4725 (emphasis added). Contrary to the Biological Report's findings, the Rule relies on one factor—physical distance—to determine if Pacific Coast wolves are discrete when this factor alone does not reflect the best available science on differentiation in wolf populations. The Service fails in the Rule to analyze physiological, ecological, or behavioral factors to evaluate discreteness as required by the Distinct Population Segment Policy despite the best available science in the biological report indicating their importance.

128.     Therefore, the Rule is arbitrary, capricious, and not in accordance with law and should be set aside under the ESA and the APA. 16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706(2).

### SIXTH CLAIM FOR RELIEF

### (Violation of Endangered Species Act— Unlawful Exclusion of Wolves' Current Range in Threats Analysis)

129.     Plaintiff hereby realleges and incorporates Paragraphs 1 through 128.

130.     In considering whether to remove a species from the list, the Service must apply the section 4(a) factors to determine whether a species is endangered or threatened "throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). In order to determine this, the Service must look at the entirety of the species' current range. *See Humane Soc'y v. Zinke*, 865 F.3d at 601 ("The Endangered Species Act's text requires the Service, when reviewing and redetermining the status of a species, to look at the whole picture of the listed species, not just a segment of it.").

131.     Range includes "the general geographical area within which the species is currently found, including those areas used throughout all or part of the species' life cycle, *even if not used on a regular basis*." 79 Fed. Reg. at 37,583 (emphasis added). Nothing in this definition limits the current range to breeding pairs or populations that otherwise have high numbers. Nor would that be sensible, given the ESA's conservation purpose and its policy of "institutionalized caution." *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d

1075, 1090-91 (9th Cir. 2015) (quoting *TVA v. Hill*, 437 U.S. at 187); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d at 1073 (quoting *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1167 (9th Cir. 2010)).

132.    Here, the Service excluded large portions of range currently known to be used by wolves. *See* 85 Fed. Reg. at 69,786 (excluding areas used by dispersing wolves from the consideration of current range). Wolves are known to be present far beyond the areas where the Service performed its section 4(a) threats analysis. The Rule acknowledges that wolves have recently been found in numerous states across the West, Midwest, and Northeast. *See* 85 Fed. Reg. at 69,789. These areas, which include the Northeast, meet the regulatory definition of "range" under the Significant Portion of Its Range Policy. And they are used as "part of the species' life cycle," 79 Fed. Reg. at 37,609, through dispersal. "[D]ispersal" is a behavior that involves wolves leaving "their natal pack to locate social openings in existing packs or find a mate and form a new pack." Gray Wolf Biological Report at 7.

133.    Dispersal is a critical part of wolf behavior contributing to viability in the United States, as the Service acknowledges. 85 Fed. Reg. at 69,820 ("An important factor for maintaining genetic diversity can be connectivity or effective dispersal between populations or subpopulations."). Defining current range in a way that excludes these areas is arbitrary because it contradicts the agency's own evidence. *See State Farm*, 463 U.S. at 43.

134.    The Service therefore ignores the extinction risk to wolves in portions of their current range. According to the Rule, the "risk of human-caused mortality . . . tends to be highest for dispersing animals." 85 Fed. Reg. at 69,794; *see also id.* at 69,789 n.3 (noting wolves in large, continuous, high quality habitat have a "greater evolutionary potential and resilience to stochastic events" than wolves in smaller, more isolated habitats). The Service even "acknowledge[s] that both the West Coast States and central Rocky Mountains portions of the combined listed entity may be at greater risk from human-caused mortality or from factors related to small numbers of individuals." *Id.* at 69,889; *see*

*also id.* at 69,885 (same conclusion for 44-state entity); *id.* at 69,892 (similar conclusion for lower 48 United States entity).

135.    Even though the Service finds these wolves "may be in danger of extinction or likely to become so in the foreseeable future," *id.* at 69,885, 69,889, 69,893—which is the core of the statutory definitions for an endangered or threatened species, 16 U.S.C. § 1532(6), (20)—the Service ignores this threat because, according to the agency, these wolves are not "significant under any reasonable definition of that term," 85 Fed. Reg. at 69,885, 69,889, 69,893.

136.    Therefore, the Rule is arbitrary, capricious, and not in accordance with law and should be set aside under the ESA and the APA. 16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706(2).

## SEVENTH CLAIM FOR RELIEF

### (Violation of Endangered Species Act— Failure to Consider Impacts from Loss of Historical Range)

137.    Plaintiff hereby realleges and incorporates Paragraphs 1 through 136.

138.    The Service also fails to analyze the impact of lost historical range for gray wolves, in violation of the ESA and the Service's Significant Portion of Its Range Policy. Although it is permissible for the Service to define the term "range" to mean "current range" for the purposes of the definitions of threatened and endangered species, the Service cannot ignore the impact of lost historical range on a species' status. *See Humane Soc'y v. Zinke*, 865 F.3d at 606-07; *Ctr. for Biological Diversity v. Zinke*, 900 F.3d at 1066-67.

139.    According to the Service's Significant Portion of Its Range Policy, a species may be "endangered or threatened throughout all or a significant portion of its current range because [the] loss of historical range is so substantial that it undermines the viability of the species as it exists today." 79 Fed. Reg. at 37,584. The Service "must also consider the causes of that loss of historical range. If the causes of the loss are still continuing, then that loss is also relevant as evidence of the effects of an ongoing threat." *Id.*

140.     Instead of analyzing the impacts of lost historical range, the Service claims that it "take[s] into account the effect [of] lost historical range . . . through [the] analysis of the five factors described in section 4(a)(1) of the Act." 85 Fed. Reg. at 69,793. However, at no point does the Service ever actually describe how it considered the effect of lost range or whether the causes of that loss are ongoing. This approach is insufficient.

141.     In failing to consider the effects of lost historical range or if the causes of that loss are ongoing, the Service "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

142.     Therefore, the Rule is arbitrary, capricious, and not in accordance with law and should be set aside under the ESA and the APA. 16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706(2).

## EIGHTH CLAIM FOR RELIEF

**(Violation of Endangered Species Act and Administrative Procedure Act—Failure to Provide Fair Notice of Alternative Analysis)**

143.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 142.

144.     The Rule includes a novel analysis that combines all gray wolves in the lower 48 into one entity for the purpose of delisting—including Northern Rockies wolves that are not currently protected as endangered—that was not included in the Proposed Rule. *See* 85 Fed. Reg. at 69,784 (listing this entity separately from "the approach in [the] proposed rule"). This new analysis is arbitrary and capricious because it is not one that "interested parties reasonably could have anticipated in the final rulemaking from the proposed rule." *Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 873, 882 (9th Cir. 2020) (quotation marks omitted). It is, therefore, not a "logical outgrowth of the notice and comments received." *Id.* (quotation marks omitted).

145.     As a part of this new alternative analysis, the Rule devotes significant ink to the status and management of wolves in geographic areas that were not covered, or were only covered in passing, by the Proposed Rule. *See generally* 85 Fed. Reg. at 69,797-807 (human-caused mortality in Idaho, Montana, and Wyoming); *id.* at 69,816 (suitable habitat

and prey availability in the Northern Rockies); *id.* at 69,822-25 (management in the delisted Northern Rockies). This new information in turn serves as the foundation for the Service's finding about the status of wolves in the "lower 48 United States entity," a new creation of the Rule. *Id.* at 69,893.

146.    Commenters, including scientific peer reviewers, did not have notice that the Service would be examining the recovery status of Northern Rockies wolves or that the Service would create a new "lower 48 United States entity." Because the Service included this information and entity for the first time in the Rule, that rule is not a logical outgrowth of the Proposed Rule. *See NRDC v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002).

147.    Therefore, the Rule is arbitrary, capricious, and not in accordance with law and should be set aside under the ESA and the APA. 16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

(1)    Declare that Interior and the Service acted arbitrarily, capriciously, and contrary to ESA and its implementing regulations and in violation of the APA in issuing the November 3, 2020 Rule;

(2)    Hold unlawful and vacate the November 3, 2020 Rule;

(3)    Issue injunctive relief as necessary to prevent the implementation of the Rule;

(4)    Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees; and

(5)    Grant Plaintiff such further and additional relief as the Court may deem just and proper.

DATED this 25th day of January, 2021.

Respectfully submitted,

/s/ Claire Woods
CLAIRE WOODS (SBN 282348)
Natural Resources Defense Council
1314 Second Street

Santa Monica, CA 90401
Telephone: (310) 434-2335
Fax: (415) 795-4799
E-mail: cwoods@nrdc.org

FRANCIS W. STURGES, JR.
*[Pro Hac Vice Admission Forthcoming]*
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 847-6807
Fax: (415) 795-4799
E-mail: fsturges@nrdc.org

*Counsel for Plaintiff Natural Resources Defense Council*

Complaint for Declaratory and Injunctive Relief