TODD KIM, Assistant Attorney General
SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Section Chief
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace 370
Denver, Colorado 80202
Phone: (303) 844-1479 / Fax: (303) 844-1375
Email: Michael.Eitel@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FISH AND WILDLIFE SERVICE, et al.,<br><br>Defendants. | Case No. 4:21-cv-00344-JSW<br><br>4:21-cv-00349-JSW<br><br>4:21-cv-00561-JSW |
| WILDEARTH GUARDIANS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DEBRA HAALAND, U.S. SECRETARY OF THE INTERIOR, et al.,<br><br>Defendants. | **FEDERAL DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>Defendants. | Date:  November 12, 2021<br>Time: 9:00 AM<br>Courtroom: 5<br>Judge: Hon. Jeffrey S. White |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................... 1

II.     ARGUMENT .................................................................................................. 2

      A.      The Service properly removed protections for the Minnesota and 44-State entities because they do not constitute protectable "species" under the ESA. .................... 5

      B.      The Court may uphold the 2020 Rule on the alternative ground that the gray wolf entities are not threatened or endangered ............................................................. 11

            1.      The Service considered the full entities previously listed as threatened or endangered. ............................................................................................... 11

            2.      The Service rationally analyzed the status of and threats to wolves in significant portions of their range in the United States............................. 14

            3.      The Service's five-factor inquiry considering threats to gray wolves is reasoned. ................................................................................................... 17

                 a.  The Service considered the effects of historical range loss when it analyzed the threat of human-caused mortality .................................... 18

                 b.  The Service rationally evaluated existing regulatory mechanisms ...... 19

            4.      The Service reasonably denied the 2018 petition and will address new facts in its status review of wolves in the Western U.S..................................... 24

            5.      If the Court rules in Plaintiffs' favor on claims challenging the delisting rule, the appropriate remedy is remand to the agency for reconsideration ........................................................................................ 26

V.      CONCLUSION.............................................................................................. 29

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE**

*Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103 (D.D.C. 2018) ....................................... 26

*Carnegie Nat. Gas Co. v. FERC*, 968 F.2d 1291 (D.C. Cir. 1992) ............................................ 4

*City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020) ............................................ 7

*Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020) .......................................... 9

*Ctr. for Biological Diversity v. Jewell*, 2014 WL 5703029 (D. Ariz. Nov. 5, 2014) .................... 4

*Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009)................................ 15

*Ctr. for Biological Diversity v. Kempthorne*, No. C 06-04186 WHA, 2007 WL 163244 (N.D.
    Cal. Jan. 19, 2007)................................................................................................... 25

*Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137 (D. Colo. 2004)................ 25

*Ctr. for Biological Diversity v. Salazar*, No. CV10-2130-PHX-DGC, 2012 WL 78943 (D. Ariz.
    Jan. 11, 2012) ............................................................................................. 27, 28, 29

*Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054 (9th Cir. 2017) ........................................ 15

*Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018) .................................. 18, 19

*Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010)..................................... 4, 9

*Defs. of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001) .............................................. 7, 12

*Defs. of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017) ........................................... passim

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891  (2020) ...................... 26

*FCC v. Fox Television Stations*, 556 U.S. 502 (2009)................................................................ 8

*Gordon v. Norton*, 322 F.3d 1213 (10th Cir. 2003)................................................................ 1

*Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ............................ 21

*Greenwood v. FAA*, 28 F.3d 971 (9th Cir. 1994)................................................................... 10

*Helvering v. Wilshire Oil Co.*, 308 U.S. 90 (1939)........................................................... 7, 10

*Hosp. of Barstow, Inc. v. NRLB*, 820 F.3d 440 (D.C. Cir. 2016) ............................................. 14

*Humane Soc'y of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) ..................... passim

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) .................................... 11, 28

*Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996)................................................... 28

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................ 7

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211 (1991)................... 10

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)...................................... 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

   463 U.S. 29 (1983) ...................................................................... 2, 6, 28

*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) ............................... 14

*Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893 (9th Cir. 2020) ....................................... 28

*Nat'l Fam. Farm Coal. v. EPA*, 960 F.3d 1120 (9th Cir. 2020) ..................................... 29

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803 (9th Cir. 2018) ................... 28

*N. Plains Res. Council v. U.S. Army Corps of Engrs.*, 460 F. Supp. 3d 1030 (D. Mont. 2020)... 28

*Rybachek v. EPA*, 904 F.2d 1276 (9th Cir. 1990)................................................... 11

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014)................. 17, 22

*San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014) ................. 15, 17

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ......................................................... 6

*Singh v. U.S. Dep't of Just.*, 461 F.3d 290 (2d Cir. 2006) ......................................... 9

*Trout Unlimited v. Lohn*, 559 F.3d 946 (9th Cir. 2009) ...................................... passim

*United States v. Nixon*, 418 U.S. 683 (1974) ..................................................... 6

*Wyo. Farm Bureau v. Babbitt*, 987 F. Supp. 1349 (D. Wyo. 1997) .................................. 1

**STATUTES**

5 U.S.C. § 706(2)(C).............................................................................. 7

16 U.S.C. § 1532.................................................................................. 9

16 U.S.C. § 1532(6).............................................................................. 2

16 U.S.C. § 1533(a)(1)........................................................................... 8

16 U.S.C. § 1533(a)(1)(A)-(E).................................................................... 2

16 U.S.C. § 1533(c)(2)........................................................................ 8, 10

16 U.S.C. § 1533(c)(2)(A)........................................................................ 8

16 U.S.C. § 1532(16)........................................................................... 4, 5

1

2 **FEDERAL REGULATIONS**

3 50 C.F.R. § 424.11(e)(3) ............................................................................................. 4, 27

4 50 C.F.R. § 424.14(h)(1)(iii) ............................................................................................. 25

5 43 Fed. Reg. 9607 (Mar. 9, 1978) ..................................................................................... 27

6 61 Fed. Reg. 4722 (Feb. 7, 1996) .................................................................................. 8, 14

7 68 Fed. Reg. 15,804, 15,818 (Apr. 1, 2003) ............................................................... 14, 20

8 78 Fed. Reg. 35,664, 35,711-13 (June 13, 2013) ............................................................. 13

9 74 Fed. Reg. 47483 (Sept. 16, 2009) ................................................................................ 27

10 75 Fed. Reg. 65574 (Oct. 26, 2010) ................................................................................. 27

11 Fed. Reg. 55,529 (Sept. 10, 2012). .................................................................................. 15

12 86 Fed. Reg. at 51,859 ..................................................................................................... 26

13 86 Fed. Reg. 51857 (Sept. 17, 2021) ................................................................................. 1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

The U.S. Fish and Wildlife Service's longstanding commitment to the protection and recovery of gray wolves is well documented and ongoing. The Service began protecting gray wolves under the predecessor to the Endangered Species Act (ESA) and continued to do so until the species' delisting. It weathered sustained legal challenges to its efforts to reintroduce gray wolves into Wyoming and central Idaho in the 1990s.[1] For over half a century, it worked to restore robust gray wolf populations in the Northern Rocky Mountain (NRM) and Great Lakes regions—precisely what it said it would do when it listed gray wolves under the ESA in 1978.[2] Currently, the Service is prioritizing protection of gray wolves by initiating a full status review under the listing provisions of the ESA to evaluate recent actions by Idaho and Montana that threaten to significantly increase human-caused mortality and other threats to gray wolves in the Western United States.[3] Plaintiffs' position that the Service seeks to avoid protecting gray wolves simply is not grounded in fact.

Plaintiffs' ungrounded narrative also does not show that the Service erred in issuing the 2020 delisting rule. The Service did exactly what the ESA and Ninth Circuit law require: it rationally conducted the familiar two-phase inquiry the Service performs in every listing and delisting action under the ESA. The Service first concluded that neither listed wolf entity— wolves in Minnesota and wolves in portions of 44 States—constituted a protectable "species" as

---

[1] *See, e.g.*, *Wyo. Farm Bureau v. Babbitt*, 987 F. Supp. 1349 (D. Wyo. 1997), *rev'd*, 199 F.3d 1224 (10th Cir. 2000); *Gordon v. Norton*, 322 F.3d 1213 (10th Cir. 2003).

[2] In 1978, the Service consolidated multiple prior wolf listing rules to designate wolves as threatened in Minnesota and endangered in the remaining lower 48 States and Mexico. Final Rule, 43 Fed. Reg. 9607 (Mar. 9, 1978). In doing so, the Service provided firm assurances that it would continue to treat wolf subspecies as separate entities when protecting and recovering wolves. *Id.* at 9609-10. Consistent with that approach, the Service implemented separate recovery programs in three regions of the country (NRM, Southwestern U.S., and Eastern U.S.). AR_39-40.

[3] *See* 90-Day Finding on Two Petitions to List the Gray Wolf in the Western United States, 86 Fed. Reg. 51857 (Sept. 17, 2021); *see also* Press Release, *Service to Initiate Status Review of Gray Wolf in the Western U.S.*, U.S. Fish and Wildlife Service, https://www.fws.gov/news/ShowNews.cfm?ref=service-to-initiate-status-review-of-gray-wolf-in-the-western-us-&_ID=36998 (last visited Oct. 8, 2021).

Congress defined the term, and so the Service could not lawfully protect them as "threatened species" or "endangered species." Plaintiffs' reply does not argue either entity constitutes a protectable "species" as defined under the ESA. Plaintiffs essentially dodge the issue and argue that the Court and Service should too. But that is not what the ESA requires.

Additionally, to ensure that no population of gray wolves was left vulnerable because of the statutorily required delisting of entities that are not species, the Service exercised its discretion to consider the status of wolves in the lower 48 States and found that they were biologically recovered. The Service evaluated whether the two listed entities, or other configurations of wolves, might merit protection as threatened or endangered species. This exhaustive inquiry revealed that gray wolves in the lower 48 States were not in danger of extinction or likely to become so in the foreseeable future. In response, Plaintiffs disparage the Service's expert analysis by raising their own preferred interpretations of the facts and law. But what Plaintiffs have not done is show that the Service "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Because the Service's 2020 Rule withstands scrutiny under a straightforward review of the facts and law, the Court should grant Federal Defendants' motion for summary judgment.

## II.     ARGUMENT

There are two "analytically distinct phases" in the Service's determination to list or delist a species: (1) the Service must identify a protectable "species" as Congress defined the term in the ESA, and (2) the Service must consider the status of and threats to that "species." *Trout Unlimited v. Lohn*, 559 F.3d 946, 955 (9th Cir. 2009). When the Service determines the entity being considered is not a "species," the Service may not legally protect that entity as a "threatened species" or an "endangered species." *Id.* The definitions of "threatened species" and "endangered species," as well as each of the statutory listing factors, are tied to and depend on the upfront identification of a valid, protectable "species." 16 U.S.C. § 1532(6), (20); *id.* §

1533(a)(1)(A)-(E). Alternatively, whether an entity constitutes a protectable "species," such as a distinct population segment (DPS), becomes irrelevant if, based on the statutory listing factors, the entity being considered is neither in danger of extinction now nor likely to become so in the foreseeable future. In that scenario, the entity could not meet the definition of a "threatened species" or an "endangered species," even assuming the entity qualified as a "species" in the first instance. *See* ECF 107 (hereinafter, "Fed. Defs. Br.") at 16-18.

Under this two-phase inquiry, independent grounds can exist to conclude that an entity fails to qualify as a "threatened species" or an "endangered species"—the entity may not be a "species" *or* it may not be in danger of extinction now ("endangered species") or likely to become so in the foreseeable future ("threatened species"). On the other hand, both analytically distinct phases must be satisfied in the affirmative to protect an entity under the ESA—the entity must constitute a "species" *and* be in danger of extinction now or likely to become so in the foreseeable future.

The Service addressed both phases of the ESA listing and delisting inquiry in the 2020 Rule. In the first phase, the Service concluded that neither listed entity (the Minnesota entity and the 44-State entity) constitutes a protectable "species." AR_43-44. In the second phase, the Service concluded that, based on the best scientific and commercial data available after considering State efforts to protect the species, neither entity was endangered or threatened. *Id.* at AR_44-46, 139-153. Both grounds provide independent bases for the Service's regulatory action, and each determination separately justifies the Service's decision under the ESA and the Administrative Procedure Act (APA). AR_44; Fed. Defs. Br. at 20-21. The Court therefore may uphold the Service's 2020 Rule so long as the agency provided a rational basis for its determination on at least one of the distinct phases of the listing inquiry. Of course, the Court also may uphold the 2020 Rule based on the agency's rational bases for both determinations.

On reply, Plaintiffs would have the Court elide the Service's first basis for the delisting rule—here, whether the Minnesota entity or the 44-State entity constitutes a protectable "species." Plaintiffs present various arguments to justify their view that the Court should focus solely on the second phase of the Service's inquiry. *See* ECF 129 (hereinafter "Pls. Reply") at 2-

8. But Plaintiffs do not dispute that the ESA imposes two "analytically distinct" phases for the listing and delisting inquiry, *Trout Unlimited*, 559 F.3d at 955, or that the Service's regulatory action can be justified based *solely* on findings at the first phase, *Ctr. for Biological Diversity v. Jewell*, 12-cv-2296, 2014 WL 5703029, at *13 (D. Ariz. Nov. 5, 2014) (absence of protectable "species" precludes the Service from protecting an entity under the ESA, regardless of its endangerment findings), *aff'd sub nom.*, *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054 (9th Cir. 2017); *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1221-22 (D. Mont. 2010) (holding the Service "violated the plain terms of the ESA" because it listed wolves in Wyoming and, thus, listed and protected "something less than a DPS"); *see also* Fed. Defs. Br. at 18 & n.16. Nor do Plaintiffs wrestle with the Service's express finding in the 2020 Rule that the lack of a protectable "species" constitutes "an *independent* basis for delisting." AR_44 (emphasis added).[4] And Plaintiffs err in assuming that the Service's voluntary decision to consider both phases of the listing inquiry somehow undermines its decision. District courts often invoke independent grounds for a holding, and an appellate court need only sustain the district court on one of the grounds to uphold the decision. So too here. The Service invoked two independent grounds to delist wolves in Minnesota and the 44-States. If the Court finds that one of those grounds is lawful, it should uphold the Rule. *See Carnegie Nat. Gas Co. v. FERC*, 968 F.2d 1291, 1294 (D.C. Cir. 1992) (reviewing court will "sustain an agency decision resting on several independent grounds if any of those grounds validly supports the result").

Plaintiffs' proffered rule that a court may ignore an independent basis for an agency action also makes little sense because it would deter agencies from being thorough and precautionary in their regulatory actions and analyses. In this case, for example, Plaintiffs'

---

[4] Plaintiffs seemingly object to the Service's 2019 regulation that provides for delisting an entity when it does not constitute a protectable "species." Pls. Reply at 8 n.5 (citing 50 C.F.R. § 424.11(e)(3)). Although Plaintiffs cite the regulation and a separate legal challenge, they do not develop an argument that the regulation is unlawful. Plaintiffs do not explain, for example, how the Service could lawfully protect something other than a "species" when the plain language of the statute limits its application to "species." *See* 16 U.S.C. §§ 1532(16) (defining "species"), 1533(a)(1) (directing the Secretary to determine "whether any species is an endangered species or a threatened species"), 1533(c)(1) (directing the Secretary to publish lists of "all species determined … to be endangered species and … threatened species").

preferred rule would have created an incentive for the Service to stop its regulatory analysis at the first analytically distinct phase of the listing inquiry—the absence of a protectable "species"—and refrain from scrutinizing whether other gray wolf entities could merit protection under the ESA. AR_44 (the Service considered "the status of gray wolves in several configurations … to eliminate the possibility of removing protections for any gray wolves that might meet the Act's definition of a 'species' and might be endangered or threatened"). This result would not further the ESA's administration, as Plaintiffs themselves acknowledge. Pls. Reply at 9 (arguing the Service should do exactly what it did in this rulemaking—consider whether other entities merit protection concurrently with the removal of protections for the Minnesota and 44-State entities).

In short, the Service addressed each of the two analytically distinct phases of the listing inquiry. We address below the Service's determinations on both phases of the inquiry, either of which suffices to justify the Service's regulatory action. Together, they definitively establish that the Service correctly determined that neither the Minnesota entity nor the 44-State entity constitutes a threatened species or endangered species under the ESA, and it properly removed them from the ESA's list of endangered and threatened wildlife.

A.      **The Service properly removed protections for the Minnesota and 44-State entities because they do not constitute protectable "species" under the ESA.**

The ESA allows the Service to protect only biological species and subspecies, or distinct population segments of a biological species or subspecies. 16 U.S.C. § 1532(16). In the proposed and final rules, the Service determined that the listed wolf entities (the Minnesota and 44-State entities) do not constitute protectable "species" as defined under the ESA. AR_43-44. Even on reply, Plaintiffs never dispute the Service's substantive finding that neither the Minnesota entity nor the 44-State entity constitutes a protectable "species" as Congress defined the term.[5] This should end the matter. The ESA authorizes the Service to list "species," not other groupings of

---

[5] Nor do Plaintiffs dispute that their own petitions asking the Service to list gray wolf entities do not identify the Minnesota or 44-State entities as protectable "species" under the ESA. Pls. Reply at 28 n.22; *see also* Fed. Defs. Br. at 24 n.22.

1   animals, and the two entities previously on the list do not qualify as "species." Fed. Defs. Br. at

2   18-20. The Service therefore acted consistently with the APA and ESA by issuing a rule that

3   removes the prior wolf listings.

4       Likely because Plaintiffs have no legal bases to challenge the Service's determination,

5   they urge the Court to disregard the "species" determination outright. None of Plaintiffs'

6   proffered reasons supporting this position has merit.

7       Plaintiffs first argue that the Service's "species" determination constitutes an improper

8   post hoc rationalization. Pls. Reply at 3-4. An improper post hoc rationalization is a reason

9   offered to support agency action that the agency itself did not identify before it took final action.

10  *State Farm,* 463 U.S. at 43, 49-50. Courts disregard post hoc rationalizations because the

11  agency's "action must be measured by what [it] did, not by what it might have done." *SEC v.*

12  *Chenery Corp.*, 318 U.S. 80, 93-94 (1943). The Service's proposed and final rules contain and

13  develop the finding that neither the Minnesota entity nor the 44-State entity constitutes a

14  protectable "species." AR_20102-03 (proposed rule); AR_43-44 (final rule); *see also* AR_103

15  (noting public comments stating that the listed entities should be delisted because they are not

16  "species"). Contrary to Plaintiffs' claims, the Service also determined that the lack of a species

17  constitutes an "independent basis for delisting, which is based on the plain language of the Act."

18  AR_44. These threshold, dispositive determinations are expressly made in the Rule and,

19  therefore, cannot be improper post hoc rationalizations, notwithstanding that the Service *also*

20  provided a second, distinct basis for its determination.

21      Plaintiffs next reframe Federal Defendants' position as arguing that Congress'

22  amendment to the statutory definition of "species" in 1978 had the effect of "suddenly" delisting

23  gray wolves. Pls. Reply at 4-6. Plaintiffs then challenge that reframed argument. *Id*. But Federal

24  Defendants never made this argument. The Service never contended that Congress' amended

25  definition of "species" in 1978 was self-executing and relieved the Service of an obligation to

26  address, in rulemaking, the application of the 1978 amendments to listing rules that pre-date the

27  amendments. Agency regulations, after all, generally remain binding until modified through

28  subsequent rulemaking. *United States v. Nixon*, 418 U.S. 683, 696 (1974) ("So long as this

regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and to enforce it.").

The Service's position is far more limited. When, as here, the Service engages in rulemaking under the ESA, it must ensure that this rulemaking complies with both the facts and law in existence when it acts. *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) (once the agency "has responded to a petition for rulemaking, its reasons for action or inaction must conform to the authorizing statute"). Thus, when the Service initiated rulemaking to address the Minnesota entity and the 44-State entity in 2019, it had to ensure the final action on those two entities complied with the present statutory definition of "species." Fed. Defs. Br. at 20 (citing 5 U.S.C. § 706(2)(C) and *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1146 (9th Cir. 2001)). Plaintiffs' decision to focus on 1978, rather than the facts and law existing in 2020 when the Service acted, does not identify a defect in the 2020 Rule.

In an equally problematic argument, Plaintiffs suggest that past listing rules effectively codified the prior wolf entities as "species" under the ESA, thus precluding the Service from addressing the validity of those entities in the 2020 Rule. Pls. Reply at 6-8 (arguing the 1978 Rule "complied with the 'species' definition at the time" and this factor allegedly requires the Service to prospectively maintain such "species" designations).[6] Plaintiffs' view that the Service cannot alter a prior regulatory action through rulemaking is remarkable considering that Plaintiffs routinely bring lawsuits seeking to compel Federal Defendants to revise prior regulatory actions. *See, e.g.*, *id*. at 8 n.5 (noting a challenge to the 2019 ESA regulations). Plaintiffs' views also conflict with Supreme Court precedent, which long ago held that

---

[6] Plaintiffs wrongly insinuate that the Service accepted the 1978 Rule as valid for the past 42 years and thus arbitrarily diverged from the Service's positions taken in prior wolf delisting rules. Pls. Reply at 7-8.  First, Plaintiffs overstate their case when they suggest a static status quo over the past 42 years. The 44-State entity, for example, arose from recent regulatory actions, like the 2015 Rule extracting the Mexican wolf subspecies from the 1978 lower 48 entity. Fed. Defs. Br. at 9, 18-19. Second, the Service undertook many regulatory actions over the years to address the 1978 Rule's treatment of the wolf "species," with mixed success based on judicial challenges. *See* AR_40-41 (Table 1). Third, even if the Service could have acted earlier, this factor provides no reason to overturn the 2020 Rule. *Cf. City of Portland v. United States*, 969 F.3d 1020, 1047 (9th Cir. 2020) (declining to penalize an agency for "not acting earlier").

administrative agencies possess inherent authority to revise their own prior regulations.
*Helvering v. Wilshire Oil Co.*, 308 U.S. 90, 101 (1939) (rejecting a contrary rule because, in part, it would "deprive the administrative process of some of its most valuable qualities—ease of adjustment to change, flexibility in light of experience, swiftness in meeting new or emergency situations"); *see also FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (rejecting artificial distinctions "between initial agency action and subsequent agency action undoing or revising that action"). And Plaintiffs' views are particularly off base in the context of the ESA, where Congress *required* the Service to review prior listings every five years to ensure those prior listings prospectively conform to the statutory requirements. 16 U.S.C. § 1533(c)(2); *see also* Policy Regarding the Recognition of Distinct Population Segments under the Endangered Species Act, 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996) ("The appropriate application of the [DPS] policy will also be considered in the 5-year reviews of the status of listed species required by section 4(c)(2) of the Act.").

Seemingly recognizing that the plain terms of the ESA refute their view that the Service cannot revisit prior rules, Plaintiffs argue that Section 4(c) allows the Service to address only the status of a prior listed entity and not the composition of the entity itself. Pls. Reply at 7.[7] Plaintiffs are correct that Section 4(c)'s requirement to review "any such species" refers to the species or entity as it appears on the list of endangered and threatened species. 16 U.S.C. § 1533(c)(2)(A), (B). But this provision identifies *the object* of the Service's review; it does not instruct the agency what to do with that entity prospectively. The rest of Section 4(c) provides this guidance, instructing the Service to review the listed species *using the same standards* that apply to the initial decision to list a species. *See* 16 U.S.C. § 1533(c)(2) ("Each determination under subparagraph (B)" relating to whether a prior listing should be changed "shall be made in accordance with the provisions of subsections (a) and (b)."). Those listing standards include the

---

[7] The D.C. Circuit rejected a similar argument raised by Plaintiffs in support of their position that the Service could not use the DPS authority to designate a Western Great Lakes DPS for the purpose of delisting it. *See Humane Soc'y of the United States v. Zinke*, 865 F.3d 585, 598 (D.C. Cir. 2017) (just as the Service may divide out a DPS at the initial listing stage, it "likewise can reasonably read the statute to permit similar determinations at the revision stage").

1   requirement to ensure that the entity constitutes a protectable "species" under the ESA. 16 U.S.C.

2   § 1533(a)(1) (requiring the Service to consider whether a "species" as defined by the ESA

3   qualifies as a threatened species or endangered species); *Trout Unlimited*, 559 F.3d at 949, 955.

4           The only way to circumvent this result is to interpret "species" in Section 4(a) differently

5   depending on the context in which the Service is applying these provisions. Under Plaintiffs'

6   view, Congress' use of "species" in Section 4(a) presumptively carries the meaning in the

7   statutory definition when the Service first adds a species to the list. But when the Service later

8   reviews that previously listed entity, Plaintiffs contend the term "species" as used in Section 4(a)

9   means the entity that the Service listed. Pls. Reply at 7. Congress did not adopt such arbitrary

10  distinctions. Indeed, in Plaintiffs' view the Service would remain powerless to revise a listing

11  even if the Service's initial species determination was indisputably erroneous. This is not the

12  law, as Congress stated explicitly that "species" carries the same meaning throughout "this

13  chapter," including in Section 4's listing and delisting procedures. 16 U.S.C. § 1532.[8]

14          Plaintiffs cannot avoid this straightforward result by appealing to notions of equity. As in

15  their opening brief, Plaintiffs accuse the Service of unfairly exploiting past regulatory actions

16  that transformed once valid wolf "species" in the lower 48 States into remnant entities that are

17  not a protectable "species" under the ESA. Pls. Reply at 6-7 (citing *Humane Soc'y*, 865 F.3d at

18  602-06, and *Crow Indian Tribe v. United States*, 965 F.3d 662, 677-78 (9th Cir. 2020), two cases

19  holding that the Service must consider the effects of carving up previously listed "species" on the

20  resultant remnant entities). Plaintiffs' arguments undercut their case; they presume that the

21  Minnesota entity and the 44-State entity are "unlistable remnant" entities and *not* valid "species"

22  that the Service can protect under the ESA. Pls. Reply at 6. Regardless, Plaintiffs are wrong that

23  administrative agencies cannot address the consequences of their own prior rules. *See, e.g.*, *Singh*

24  *v. U.S. Dep't of Just.*, 461 F.3d 290, 296 (2d Cir. 2006) ("If the agency wishes to rescind or

25

26  _____

    [8] Plaintiffs' arguments conflict with their own litigation arguments raised in other forums. In

27  *Defenders of Wildlife v. Salazar*, many of these same plaintiffs argued "that the word species
    must be 'given the same meaning' throughout the statute," 729 F. Supp. 2d at 1217, and the

28  Court agreed. *See id*. at 1221 (holding that the statute's "definition of 'species' applies not only
    when defining a species, but to all sections of the ESA").

1    revise these regulations to render them facially consistent with the relevant statute, it has the

2    authority and the means to do so."). Courts, in fact, provide agencies with wide latitude to

3    address existing regulatory problems because agencies should be encouraged to deal with the

4    consequences of prior rules and not prohibited from doing so. *Helvering,* 308 U.S. at 101; *see*

5    *also Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 213-14, 231-31

6    (1991) (not only may an agency address existing problems, but it has flexibility to address only

7    *part* of the problem).

8           Plaintiffs have failed to present a cogent argument that the Service's 2020 Rule violates

9    the ESA. At summary judgment, Plaintiffs did not argue that the Service's "species"

10   determination was unlawful, despite raising those claims in their complaints. Fed. Defs. Br. at 16

11   n. 14. While Plaintiffs now resist waiver, Pls. Reply at 4 n.2,[9] their reply still does not

12   substantively contest the Service's "species" determinations. They decline to argue to this Court,

13   or to the agency in pending administrative petitions, that the Minnesota and 44-State entities are

14   "species" as Congress defined that term in the ESA. Likewise, Plaintiffs argue that the Service

15   cannot change prior "species" designations, even though (1) the statute specifically instructs the

16   Service to review and, when appropriate, correct prior listing rules, 16 U.S.C. § 1533(c)(2), and

17   (2) Plaintiffs fault the Service here for denying a petition *to revise* the Minnesota and 44-State

18   wolf entities prospectively, Pls. Reply at 28-29 & 28 n.22. These confusing and incorrect

19   arguments confirm the Service applied the law as written when it concluded that the listed wolf

20   entities in Minnesota and the 44 States do not conform to the ESA's definition of "species" and

21   thus were not properly listed as "threatened species" and "endangered species." This follows

22   Congress' instruction to the Service to periodically review prior listings to ensure they are

23   consistent with the ESA. And, as the Service concluded, this is an independent basis for the

24   Service's delisting rule under the ESA. AR_43-44. The Court therefore can and should uphold

25   the 2020 Rule on this basis alone.

26   _____

27   [9] Contrary to Plaintiffs' claims, Federal Defendants' briefing cannot provide a basis to grant
     summary judgment *to Plaintiffs* on claims pled in the Complaint but abandoned during briefing.

28   Fed. Defs. Br. at 16 n.14 (citing *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994)).

**B.      The Court may uphold the 2020 Rule on the alternative ground that the gray wolf entities are not threatened or endangered.**

Even though the Service properly determined that neither the Minnesota entity nor the 44-State entity qualifies as a listable, protectable "species," the Service also conservatively addressed the second analytically distinct phase of the listing inquiry. It reviewed the status of and threats to the listed entities and also considered whether other wolf configurations should be protected under the ESA concurrently with the removal of protections for the Minnesota entity and the 44-State entity.[10] Based on the best scientific and commercial data available to the Service when it acted, it reasonably concluded that the listed entities and the other configurations it evaluated were not endangered species or threatened species. The Service's substantive determinations provide a second independent basis for the Court to uphold the 2020 Rule.

**1.      The Service considered the full entities previously listed as threatened or endangered.**

Plaintiffs' reply carries forward their initial flawed argument that the Service did not consider the entire Minnesota or 44-State wolf entities. As in their opening brief, Plaintiffs declare that the Service failed to "evaluate gray wolves across the full geography of where they were listed" and failed to "consider[] threats to other wolves" outside the core metapopulations. Pls. Reply at 9. The arguments are no more valid the second time. The 2020 Rule facially

---

[10] The Service fully explained why it considered the status of gray wolves in several different configurations. AR_44-45. Plaintiffs' logical outgrowth argument, Pls. Reply at 27-28, is not legally relevant because the Court should uphold the 2020 Rule based on the Service's independent finding that the listed entities were not protectable "species." *See* Section A, *supra*. Still, even if the Court considers that argument, it fails on the merits because the analysis of the Lower 48 entity was a logical outgrowth of the proposal and public comments received. Fed. Defs. Br. at 26; *see also* AR_103-04. This is not a case in which the Service relied on new data in its final rule without providing an opportunity for the public to comment on the data. *See* Pls. Reply at 27 (citing *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402–04 (9th Cir. 1995)). Here, the Service relied on the same scientific studies and underlying biological report but expanded the threats analysis to include delisted NRM wolves in response to public comments criticizing the approach in the proposed rule. AR_103. The additional analysis was "in character with the original proposal and a logical outgrowth of the notice and comments received." *Rybachek v. EPA*, 904 F.2d 1276, 1287-88 (9th Cir. 1990). And Plaintiffs can claim no harm from the inclusion of NRM wolves in the analysis because the 2020 Rule had no effect on the listing status of those wolves. AR_45, 104.

analyzes wolves everywhere in the lower 48 States, including throughout the boundaries of the previously listed entities. Fed. Defs. Br. at 27-31. And Plaintiffs' own reply brief acknowledges the Service analyzed the status of wolves outside the two core metapopulations, like wolves in the West Coast States. Pls. Reply at 15-19. Plaintiffs thus conflate their disagreement with the Service's analysis with a failure to analyze.

Plaintiffs pair their disregard for the facts with a refusal to explain why two robust metapopulations comprised of thousands of wolves that are biologically connected to tens of thousands of wolves in Canada cannot support a determination that wolves in the lower 48 States are recovered—i.e., that they are not in danger of extinction now or in the foreseeable future. Fed. Defs. Br. at 7, 29. Plaintiffs instead downplay the significance of these metapopulations and repeat the refrain that the Service failed to consider threats to other wolves in the lower 48 States. Pls. Reply at 9. As we detailed, however, a species need not be restored to arbitrarily defined portions of its historical range to be recovered under the ESA. Fed. Defs. Br. at 32 (citing AR_51, 116 and *Defs. of Wildlife v. Norton*, 258 F.3d at 1143). Plaintiffs' policy preference is not the governing law and does not undermine the Service's rule. This is particularly the case here, where the Service rationally concluded that gray wolves are robust and secure in the United States and that their continued and sustained expansion from the core metapopulations into adjacent unoccupied suitable habitat provided ample evidence of biological recovery for gray wolves in the lower 48 States. Fed. Defs. Br. 28-31; *see also* Section B.3, *infra*.

The Service also rationally analyzed the status of and threats to West Coast wolves and other wolves outside the Great Lakes region. Plaintiffs continue to ignore record evidence on the connection between NRM and West Coast wolves and mischaracterize the Service's prior analyses. *See* Pls. Reply at 15-19. When there is a dispute based on science, the Service's determination is entitled to deference. *Trout Unlimited*, 559 F.3d at 959 (the agency "is entitled to decide between conflicting scientific evidence"). Here, the Service drew a rational conclusion from the best available data that West Coast wolves are biologically connected to NRM wolves.

Fed. Defs. Br. at 29-31.[11] It also explained how those facts had changed between 2009 and 2020, supporting a different conclusion. Fed. Defs. Br. at 29-30; *see also* AR_414 (from 2008 to 2019, minimum population counts increased an average of 23% per year in Washington and 18.1% in Oregon); AR_402 (research from 2018 shows that most wolves in Washington and all wolves in Oregon appear to derive from NRM wolves).

Plaintiffs' view that West Coast wolves "might be discrete" is not supported by the biology of those wolves or the DPS policy. *See* Pls. Reply at 16-17. The Service fully analyzed that issue in its 2013 status review and proposal to remove ESA protections for gray wolves throughout the lower 48 States, 78 Fed. Reg. 35,664, 35,711-13 (June 13, 2013), which was incorporated by reference into the 2019 proposed delisting rule. AR_20102. The Service considered both (1) physical factors; and (2) physiological, behavioral, or ecological factors. 78 Fed. Reg. at 35,712 ("Distances between wolves currently occupying territories on either side of the NRM DPS boundary fall well within our defined range of likely dispersal distances, suggesting that physical distance will not separate these wolves in the long term."); *id.* at 35,713 ("contemporary genetic information does not lead us to conclude that wolves on either side of the NRM DPS line have marked genetic differences").[12] Plaintiffs' argument that the West Coast wolves in the lower 48 States are genetically unique and reliant on coastal habitats conflicts with the Service's expert judgment and is not borne out by the best available scientific data.

Finally, Plaintiffs err in arguing that the Service was legally required to reconsider its prior evaluation of a possible West Coast DPS, or evaluate other possible DPSs, before removing

---

[11] *See also* AR_44 (genetic analysis shows that gray wolves in Oregon descended from NRM wolves and then expanded into California, and wolves in Washington include individuals descended from NRM wolves and Canadian wolves); *id.* ("Thus, listed wolves in the West Coast States are not genetically distinct from the NRM wolves."); AR_424 ("Populations in the western U.S. are connected as evidenced by movements between the western states . . . and genetic data."); AR_25333 ("Dispersing NRM wolves established reproducing packs in Oregon and Washington."); AR_25327 (map depicting dispersals of radio collared NRM wolves).

[12] The 2013 status review—adopted and incorporated into the 2020 Rule—expressly addresses the 2009 final rule and its conclusion about discreteness and explains the reasons underlying the change. 78 Fed. Reg. at 35,712-13. No "unexplained inconsistencies" exist between the 2020 Rule and the Service's analysis of this issue in 2009. *See* Pls. Reply at 15-16.

the listed entities. In 2003, the Service revised the 1978 listing by designating three DPSs and classifying two as threatened and one as endangered. 68 Fed. Reg. 15,804, 15,818 (Apr. 1, 2003) (noting that the 1978 listing was established before the DPS policy and suggesting that the final rule would "bring[ ] the current listing of the gray wolf into compliance with the policy"). The 2003 rule was challenged in two district court cases and vacated. AR_41. By Plaintiffs' own count, the Service has since "attempted to designate and delist gray wolf DPSs at least six times." Pls. Reply at 8; *see also* AR_41. In the 2020 Rule, FWS reasonably took a different, conservative approach and addressed the currently listed entities under multiple configurations to ensure that it captured all listed wolves in the analysis and did not leave "an unlistable remnant." *See* Pls. Reply at 6 (citing *Humane Soc'y*, 865 F.3d at 602-03). The DPS authority, which is to be used "sparingly," 61 Fed. Reg. at 4722, "allows the [Service] to provide different levels of protection to different populations of the same species." *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003). Nothing in the ESA or the DPS Policy required the Service to identify and reclassify DPSs when it had concluded, based on the best available data, that the gray wolf populations in the lower 48 States were biologically recovered.

> ### 2.      The Service rationally analyzed the status of and threats to wolves in significant portions of their range in the United States.

The Service adopted a rational standard for "significant" and explained how it applied that standard to analyze whether each entity it evaluated was threatened or endangered in a "significant portion of its range" (SPR). Fed. Defs. Br. at 32-35. The 2020 Rule on its face contradicts Plaintiffs' argument that the Service failed "'to wrestle with the relevant statutory provisions.'" *See* Pls. Reply at 10 (citations omitted). Unlike an agency action that does not "render[ ] any interpretation of the statute," *Hosp. of Barstow, Inc. v. NRLB*, 820 F.3d 440, 445 (D.C. Cir. 2016), the delisting rule explains how the Service interpreted "significant." AR_114 ("we assessed the significance of portions of the gray wolf entities addressed in this rule based on whether the portions contribute meaningfully to the resiliency, redundancy, or representation of the gray wolf entity being evaluated"). Without any agency-wide policy defining "significant," the Service reasonably implemented the statute as written, giving the statutory term

1  "its 'commonly understood meaning,' which is 'important.'" *Ctr. for Biological Diversity v.*

2  *Zinke*, 868 F.3d at 1061 (citation omitted).

3        Plaintiffs argue that it is "impossible to determine" whether a population is significant

4  under the Service's approach because it does not articulate a "measuring stick" for

5  "meaningfulness." Pls. Reply at 11. Plaintiffs prefer "defined factors, thresholds, or evidentiary

6  indicators," *see id.* n.7, but no such "guideposts" are necessary for the Service to determine

7  whether any wolf population makes a meaningful contribution to resiliency, redundancy, or

8  representation of gray wolves.[13] Here again, Plaintiffs are attempting to convert their policy

9  preference into a legal argument that would undermine the Service's discretion and expertise.

10  The Service has considerable discretion to interpret the statutory term "significant," and

11  substantial expertise to apply the term to the gray wolf populations. Plaintiffs may desire a

12  different approach, but the Service's determination is entitled to deference. *Ctr. For Biological*

13  *Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009). The Court thus should reject

14  Plaintiffs' argument that the Service's standard could facilitate "unlawful administrative

15  mischief," Pls. Reply at 12, and instead assume that the agency carried out its duties in good

16  faith. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014)

17  ("The arbitrary or capricious standard is a deferential standard of review under which the

18  agency's action carries a presumption of regularity.").

19        Equally unavailing is Plaintiffs' "Catch-22" argument that wolves in the West Coast

20  States and central Rocky Mountains are in a "no-win" situation. *See* Pls. Reply at 13. First,

21  Plaintiffs focus only on small numbers and ignore the rest of the analysis. The Service based its

22  "significance" conclusion not only on the small number of individual wolves and breeding pairs,

23  but also on: (1) the connection between those wolves and the recovered, stable NRM population;

24  

---

[13] Nor are such guideposts necessary for the courts. The D.C. Circuit, for example, did not question whether "meaningfully contribute" was a rational standard when it upheld the Service's determination applying that phrase in its 2012 rule delisting the gray wolf in Wyoming. *See Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1093 (D.C. Cir. 2017) ("The Service has offered ample rationale for determining that the predator area was never 'envisioned to meaningfully contribute to wolf recovery in the region' and is thus not a 'significant portion of its range.'") (citing 77 Fed. Reg. 55,529, 55,602-03 (Sept. 10, 2012)).

and (2) the fact that gray wolves are adaptable, generalist carnivores capable of long-distance dispersal. AR_145. Second, Plaintiffs' underlying assumption is flawed. *See* Pls. Reply at 13 (populations such as the West Coast and central Rocky Mountain wolves "cannot satisfy both significance prongs" because "a healthy population outside of a species' core habitat is not at risk while a small population will be considered insignificant"). Again, Plaintiffs' narrow focus on small numbers is misplaced. A small population that is isolated, has unique genotypic traits, and is not well-represented elsewhere could be significant under the Service's definition (i.e., both biologically meaningful and potentially endangered or threatened). And a large population outside the species' core range could be both significant and subject to threats other than small population size, such as overexploitation. But neither of these fact patterns applies here.

Plaintiffs' various objections about the relevance of range contraction, habitat, and genetic divergence, Pls. Reply at 13-14, suffer from the same flaw that undermines Plaintiffs' entire argument on SPR. Plaintiffs would prefer a different standard for "significant" that requires the Service to consider the factors that Plaintiffs believe are relevant to the analysis.[14] In

---

[14] The Service did not admit to ignoring the factors cited by Plaintiffs. *See* Pls. Reply at 13 (asserting that the Service ignored possible harm from range contraction, habitat, and genetic divergence); *see* Fed. Defs. Mem. at 35-36 (range contraction, uniqueness of the ecological setting, and genetic characteristics are DPS policy concepts, not required elements of the SPR analysis). Here, as elsewhere, Plaintiffs' arguments are based on a flawed view that the wolves currently recolonizing the West Coast States are uniquely adapted to coastal habitat and are genetically unique. *See id.* at 30-31 (wolves with coastal ancestry currently occupying the lower 48 States are not genetically predisposed or uniquely adapted to coastal habitats; wolves are habitat generalists and wolves with coastal ancestry occupy inland habitats); *see also* AR_152 (wolves in the West Coast States and central Rocky Mountains "do not contribute to the overall demographic or genetic diversity of the lower 48 United States entity and they lack genetic uniqueness relative to other wolves in the entity").

Likewise, we responded to Plaintiffs' argument that the delineation of the gray wolf's current range violates the SPR policy. *See* Pls. Reply at 14-15; *see also* Fed. Defs. Mem. at 37-38 (the Service determined current range based on existing data of wolf packs, not individual dispersers, because dispersers do not consistently use any one area); AR_46 (lone dispersers were not included in the definition of current range because "individual dispersers that do not settle in an area, survive, and reproduce do not substantively contribute to the wolf's viability (i.e., the ability of a species to sustain populations in the wild over time)"). The SPR Policy does not define "used on a regular basis," leaving room for the Service to apply its discretion. Under Plaintiffs' theory, any area in which a lone wolf has been sighted in the past 20 years is part of the "current range." *See* Pls. Br. at 27 (ECF 74 in 21-cv-344-JSW). They name 12 specific states, although

---

1    other words, Plaintiffs substitute their judgment for that of the Service and invite the Court to do

2    the same. The Court should reject this argument and defer to the Service's determination of the

3    relevant factors. *Trout Unlimited*, 559 F.3d at 956 (declining to "second-guess [the agency's]

4    resolution of [a] scientific question" in its area of technical expertise) (citation omitted).

3.   **The Service's five-factor inquiry considering threats to gray wolves is**
     **reasoned.**

7        The Service gathered and exhaustively analyzed the best scientific and commercial

8    information available to identify threats to gray wolves and evaluate whether those threats placed

9    wolves in danger of extinction, or likely to become so within the foreseeable future. Fed. Defs.

10   Br. at 38-39. The Service's determination that gray wolves do not meet the definition of an

11   endangered species or a threatened species was supported by substantial evidence, and the Court

12   should uphold it even if "'the evidence is susceptible of more than one rational interpretation.'"

13   *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citation

14   omitted).

15       Although the Service considered each threat individually and cumulatively, one threat

16   rises above the others in terms of its significance to gray wolf conservation: human-caused

17   mortality. AR_54 (regulation of human-caused mortality is "the most significant factor affecting

18   long-term conservation of wolves"). The Rule provides a rational basis for the Service's

19   determination that regulated harvest and other sources of human-caused mortality were not a

20   significant threat to the survival of gray wolves. *See, e.g.*, AR_72 ("Despite human-caused wolf

21   mortality, wolf populations have continued to increase in both number and range since the mid-

22   to-late 1970s."); AR_47 ("wolf populations can rapidly overcome severe disruptions, such as

23   pervasive human-caused mortality or disease; and they can increase rapidly after severe declines

24

25   their own evidence shows that there are no "extant gray wolf population[s]" in any of the listed
     States. AR_22018 (Petition Appendix A). Plaintiffs also note that wolves have been documented
26   "in numerous states across the West, Midwest, and Northeast." *Id.* Plaintiffs' view appears to be
     that nearly the entire lower 48 U.S. falls within the "current range," which is in essence a
27   different formulation of their flawed view that wolves cannot be considered recovered unless
     they are present in their entire historical habitat. *See* Fed. Defs. Br. at 32.
28

if the source of mortality is reduced"); AR_56 ("Regulation of human-caused mortality has significantly reduced the number of wolf mortalities caused by humans and, although illegal and accidental killing of wolves is likely to continue with or without the protections of the Act, at current levels those mortalities have had minimal impact on wolf abundance or distribution."). As in *Humane Society*, the Court here should uphold the Service's conclusion that human-caused mortality was not a significant threat to the wolf's survival. 865 F.3d at 608 (noting the "resilient growth of the gray wolf population despite the human-caused deaths"); *see also id.* at 609 ("The simple reality is that both disease- and human-caused deaths have been simultaneously afflicting the wolves, and yet the population has continued to grow nonetheless.").

### a. The Service considered the effects of historical range loss when it analyzed the threat of human-caused mortality

The Service fully accounted for the effects of lost historical range in its analysis of human-caused mortality, Fed. Defs. Br. at 40-41, satisfying its obligation under the Act and case law to "consider the historical range of a species in evaluating other aspects of the agency's listing decision." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (citing *Humane Soc'y*, 865 F.3d at 605-06). The 2020 Rule on its face contradicts Plaintiffs' assertion that the Service "committed a 'wholesale failure to address that factor.'" *See* Pls. Reply at 19 (citing *Humane Soc'y*, 865 F.3d at 607).

The Service established the appropriate timeframe for measuring historical range (the time of European settlement) and defined the physical boundaries of the relevant historical range, depicting it on a map in the rule. AR_47-49; *see also Humane Soc'y*, 865 F.3d 585 at 606-07. It then explained how it evaluates historical range loss and how it applied those principles to the gray wolf. The effects of past range reduction are captured in the analysis of current threats to the species. AR_52 ("past range reduction can reduce the redundancy, resiliency, and representation of a species in its current range, such that a species may meet the definition of an 'endangered species' or 'threatened species' under the Act"). If the causes of the range loss are ongoing at the time of the listing determination, then they are evaluated as a threat. *Id.*

1   For the gray wolf, the primary cause of range loss was human-caused mortality, a threat

2   that the Service rationally determined had been ameliorated. Fed. Defs. Br. at 40-42. The Service

3   also recognized that historical range loss may make the species more vulnerable to other threats,

4   and it analyzed each of those threats in detail. AR_52; AR_53-81. The Service noted the

5   "substantial contraction of gray wolf historical range," but it found that the range "has expanded

6   significantly" since the 1978 listing, and that both the causes (e.g., extermination efforts) and the

7   effects (e.g., reduced populations and restricted gene flow) had been ameliorated. AR_145-46

8   (44-State entity); AR_149 (combined listed entity); AR_153 (lower 48 U.S. entity). Thus, the

9   Service considered "the scope of the species' historical range, and the impact that material

10  contraction or relocation might indicate for survival within a currently constricted or confined

11  range." *Humane Soc'y*, 865 F.3d at 606. Considering this record evidence, Plaintiffs have no

12  colorable claim that the Service omitted this factor from its analysis. Rather, the Service properly

13  applied the SPR Policy's interpretation of "range" and "consider[ed] the [gray wolf's] historical

14  range in evaluating the factors that contributed to" its delisting determination. *Ctr. for Biological*

15  *Diversity v. Zinke*, 900 F.3d at 1067.

16  **b.   The Service rationally evaluated existing regulatory mechanisms**

17  Having determined that human-caused mortality was not causing gray wolves to be

18  endangered or threatened, the Service reasonably found, based on the evidence available at the

19  time of delisting, that the States had adequate regulatory mechanisms to protect gray wolves

20  from that threat after delisting. Fed. Defs. Br. at 42-49; *see also Defs. of Wildlife v. Zinke*, 849

21  F.3d 1087 (regulatory mechanisms need only protect a species "'against threats that would

22  cause the species to be 'an endangered species or a threatened species'") (citation omitted).

23  Plaintiffs raise a host of arguments criticizing the Service's analysis, *see* Pls. Reply at 19-27,

24  which boil down to several main objections, none of which undermines the Service's

25  determination.

26  First, although Plaintiffs concede in their reply that the Service "need not review each

27  and every provision of each state management plan for its basis in the best available science," *id.*

28

at 20, they still try to impose an obligation on the Service to show a level of certainty that is not supported by the ESA or case law. *See* Fed. Defs. Br. at 42-43. Plaintiffs posit that the regulatory mechanisms in the state plans "are hortatory, routinely violated, and unenforceable." Pls. Reply at 20. The Service considered and addressed those concerns in its response to comments. AR_133-34; *see also Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1083 (D.C. Cir. 2017) ("The record demonstrates that the Service reasonably and adequately responded to concerns about the reliability of [the State] management plan."). The Service explained that "States and Tribes have rules and regulations governing the take of wolves and all wildlife, with professional staff available to monitor wildlife populations and enforce wildlife laws under their jurisdiction." AR_133. In the Great Lakes States, where wolf population numbers far exceed Federal recovery requirements, AR_73, the Service expects managers to "attempt to stabilize or reduce population growth." AR_133. But there is an incentive for managers to ensure that there are enough wolves to maintain a recovered population, because reducing wolf populations down to minimum management levels "would severely limit State flexibility to address wolf conflict issues, limit wolf harvest opportunities, and increase the risk of relisting." *Id.*; *see also Defs. of Wildlife, v. Zinke*, 849 F.3d 1077, 1083-84 (D.C. Cir. 2017) ("[T]he Service could reasonably conclude that Wyoming's efforts set forth in its management plan were sufficiently certain to be implemented based on the strength of the State's incentives" to maintain flexibility to address wolf depredation, allow harvest opportunities, and avoid relisting). And, as a practical matter, it would be difficult for States to reduce wolf populations to a level that would threaten their viability because of wolves' natural reproductive capacity and dispersal ability, and the difficulty harvesting them as their numbers are reduced. AR_133-34.

Even if Plaintiffs are correct that certain regulatory measures are not enforceable, Pls. Reply at 20, the Court should uphold the Service's determination based on the many binding provisions in State law and State wolf management plans. AR_85-95; *see also Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1031 (9th Cir. 2011) ("Even assuming that the Service's consideration of the [conservation strategy's] voluntary or unenforceable components was error, its consideration of components of the [conservation strategy] that have

been made legally binding adequately supports" its Factor D determination); *Defs. of Wildlife*, 849 F.3d at 1084 (upholding the Service's "decision to delist in the absence of legal certainty").

Second, Plaintiffs disagree with the Service's conclusions about the likely effects of regulated wolf harvests in the Great Lakes States. Although Plaintiffs do not dispute that wolf populations in the Great Lakes have continued to increase despite human-caused mortality, they question the Service's determinations about how wolf populations will respond to harvests. But the best available scientific data supports the Service's conclusions that: (1) the number of wolves in the Great Lakes area far exceeds the level required to sustain the species; and (2) deliberate reductions in population size through harvest are unlikely to bring the population below the recovery threshold because wolves can withstand high levels of mortality and rebound if mortality levels are reduced. Fed. Defs. Br. at 43-47.

Significantly, Plaintiffs do not dispute that wolves "can rebound 'after an initial population decline.'" Pls. Reply at 22 (citing Fed. Defs. Br. at 40). Instead, they make an unrelated argument that the "future possibility of relisting a species" is not sufficient grounds to delist. Pls. Reply at 22. But Federal Defendants did not rely on a future possibility of relisting. Rather, they relied on evidence of how wolf populations were affected by prior hunts and their biology to conclude that "if there is a decline due to harvest, the wolf population can recover quickly if the quota is reduced." Fed Defs. Br. at 45-46. An increase in harvest levels after delisting was expected and rationally analyzed, and the Service's conclusions are supported by the results of prior harvests in the Great Lakes during periods when the species was delisted.[15]

Regardless of the source of human-caused mortality (e.g., harvest, depredation control), it is the effect of such mortality at the population level that matters for the ESA analysis. AR_135 ("we evaluate whether the use of that management tool may reduce the number of wolves in the

---

[15] The Service's analysis also tracks data showing that NRM wolf populations remained stable after delisting despite high levels of harvest. Fed. Defs. Br. at 45, n.43. Although Plaintiffs argue that the Service must evaluate regulatory mechanisms based "solely" on the best available science, Pls. Reply at 20, their criticisms of the Service's reliance on Idaho population data deviate from that standard. *See* Pls. Reply at 22. Even if Idaho's population estimates were incomplete, the Service could reasonably rely on them in the absence of superior data. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d at 601-02.

gray wolf entities to the extent that they would meet the definition of a threatened species or an endangered species under the Act."). The Service reasonably explained why gray wolves could withstand the levels of harvest that were expected after delisting, and Plaintiffs provide no evidence to the contrary that the Service overlooked. Plaintiffs' general "concerns about hunting," Pls. Reply at 22, cannot meet their burden. *See Humane Soc'y*, 865 F.3d at 610 (D.C. Cir. 2017) ("To be sure, killings are allowed at higher numbers than the Humane Society wants. That does not make the Service's decision unreasoned or arbitrary and capricious, however.").

Even accepting Plaintiffs' view that the Service should have anticipated the specifics of the February 2021 Wisconsin hunt, Pls. Reply at 21—which is wrong for the reasons explained in our opening brief, Fed. Defs. Br. at 46—that hunt is not relevant to the Court's evaluation of the 2020 Rule. Plaintiffs offer no justification for the Court to deviate from the limited scope of review in this APA case and consider post-decisional events. Fed. Defs. Br. at 28, n.25.[16] And, even if considered by the Court, the outcome of that hunt does not undermine the Service's determination. Fed. Defs. Br. at 46-47. The Service reasonably looked to the results of past hunts that occurred when wolves were federally delisted. AR_136 (harvest in Minnesota, which was as high as 413 wolves in 2012, "had minimal impact on the population"; Wisconsin hunts resulted in overall decline of 8%, but wolf population remained "well above State management goals"); *see also Humane Soc'y*, 865 F.3d at 611 ("Looking to data from 2007 to 2008 to predict the consequences of delisting was entirely reasonable because there was an absence of federal regulation and a presence of state depredation authorizations nearly identical to the regime that would operate after delisting."). Plaintiffs offer no information to contradict the data showing that such hunts did not result in significant harm to wolf populations in the Great Lakes. *See* Pls. Reply at 20.

Third, although Plaintiffs admit that "few, or no, wolves exist" in areas outside the Great Lakes, Pls. Reply at 26, they disagree with the Service's conclusions about whether wolves in

---

[16] For the same reason, the Court should not consider Plaintiffs' extra-record information on the number of wolves killed in Idaho in 2019 and 2020, and new legislation enacted in Idaho and Montana in 2021. Pls. Reply at 22-23.

those areas are necessary to maintain the recovered status of wolves in the entities that the Service evaluated. The disagreement is rooted in their incorrect view that West Coast wolves are distinct from NRM wolves. *See* Section B.1., *supra*. Any alleged flaws in the Service's analysis, *see* Pls. Reply at 23-27, are not a basis to overturn the Rule because any inadequacies in regulatory mechanisms outside the Great Lakes would not cause wolves to meet the definition of a threatened or an endangered species. Fed. Defs. Br. at 48-49; *see also* AR_143 (wolves in the West Coast States and central Rocky Mountains, and lone dispersers in other States, "are not necessary in order to conserve wolves to the point that they no longer meet the definitions of endangered or threatened under the Act").[17] Yet, although there are few wolves outside the Great Lakes, the Service evaluated regulatory mechanisms in those areas because those wolves enhance the overall viability of the entities. *See, e.g.*, AR_146 (wolves occurring outside of the Great Lakes enhance the viability of the combined listed entity). The Service rationally concluded that State management in those areas would further wolf conservation. Fed. Defs. Br. at 47-49; *see also* AR_108 (in California and Washington, wolves will continue to be protected as State endangered species until they meet State-specific recovery metrics); *id.* (in Oregon, wolves were delisted under State law in 2016 but they will continue to be protected under a State statute and management plan requiring a public rulemaking process before hunting may be authorized); *id.* (in Colorado, "wolves will continue to be classified as endangered at the State level" and managed under recommendations developed by a working group).[18]

---

[17] The analysis of wolves outside the Great Lakes is similar to the analysis the D.C. Circuit upheld in *Humane Soc'y of the United States v. Zinke*, 865 F.3d 585. The court found that the Service's decision to delist the Great Lakes wolves "notwithstanding the lack of state plans in North and South Dakota, Illinois, Iowa, Ohio, and Indiana also did not rise to the level of arbitrary-and-capricious decisionmaking given the near non-existence of gray wolves within those jurisdictions." *Id.* at 611; *see also id.* at 612 ("[F]or all six of the States with no wolf plans, the Service reasonably concluded that the deaths of any wolves that might enter those States would be so minimal as to pose no threat to the segment's survival.").

[18] For the same reasons, any alleged flaws in the analysis of federal land management in the West Coast States do not undermine the delisting rule. *See* Pls. Br., ECF No. 74, at 40; *see also* AR_135 ("maintaining Federal protections for wolves on Federal lands is not necessary for the continued viability of wolves in the Great Lakes region").

The Service provided ample evidence, based on the facts as they existed at the time of the decision, that gray wolves were not threatened or endangered because of inadequacies in existing regulatory mechanisms. Fed. Defs. Br. at 43-49. That decision is a "quintessential judgment call" that the Service is uniquely qualified to make based on its "years of experience in evaluating what is reasonably likely to be implemented and effective," and it should be upheld here. *See Defs. of Wildlife v. Zinke*, 849 F.3d at 1083 (citation omitted).

### 4.    The Service reasonably denied the 2018 petition and will address new facts in its status review of wolves in the Western U.S.

The Service applied the correct standard and properly denied Plaintiffs' 2018 petition to revise the listing for gray wolves in the Lower 48 States. AR_139; Fed. Defs. Br. at 25 n.23. Based on the facts presented in the 2018 petition, and the information available to the Service when it issued the finding, the agency reasonably found that petitioners did not provide substantial scientific or commercial information showing that revising the gray wolf listing into the DPSs proposed by petitioners may be warranted.[19]

The Service considered the threats identified in the petition. AR_347 ("We considered a 'threat' as any action or condition that may be known to, or is reasonably likely to, negatively affect individuals of a species."). Plaintiffs wrongly argue that the presence of credible information on threats "mandated a positive 90-day finding." Pls. Reply at 29. "The mere identification of threats is not sufficient to constitute substantial information indicating that revising the current gray wolf listed entities may be warranted." AR_347. Thus, the Service considered whether the information in the petition indicated that the threats may negatively affect wolves at the population level. AR_331-340 (considering information about threats or activities that might be affecting one or more individual wolves); AR_341-346 (considering whether the information indicates effects to populations, such that listing may be warranted). In

---

[19] The claim challenging the petition finding is distinct from the claims challenging the 2020 Rule, and it is brought only by the *Defenders* plaintiffs. *See* Pls. Br., ECF No. 74, at 43 n.28. As Plaintiffs acknowledge in their reply by asking the Court to vacate the petition denial, the petition finding is discrete from the delisting determination. *See* AR_138-139. Thus, any relief granted by the Court as to the petition finding should not affect the listing status of gray wolves.

1   answering these questions, the Service properly considered only: (1) the sources cited by

2   petitioners; and (2) its own policies and prior wolf rules. The Service did not simply dismiss

3   petitioners' evidence as inconclusive; it "demonstrated the unreliability of information that

4   supports the petition." *Cf. Ctr. for Biological Diversity v. Kempthorne*, No. C 06-04186 WHA,

5   2007 WL 163244, at *4 (N.D. Cal. Jan. 19, 2007).

6          Plaintiffs do not point to particular studies that the Service misconstrued. Instead, they

7   argue broadly that the Service applied the wrong standard. *See* Pls. Reply at 29. But the Service

8   considered each assertion in the petition and presented a rational explanation of why the

9   information was either not credible or conflicted with the agency's prior findings. For example,

10  in evaluating petitioners' claim that mortality rates of 30% or more are unsustainable, the Service

11  found that: (1) one source cited by petitioners is "a policy-opinion piece" that is not a reliable

12  source; and (2) the other cited sources were previously considered in one or more of the

13  Service's prior actions related to gray wolves. AR_ 344; *see also* AR_343 (studies cited by

14  petitioners did not "provide significant new information indicating that human-caused mortality

15  may have negative effects to populations or the species as a whole" despite prior Service

16  findings to the contrary); AR_330 (the Service considers its own "prior reviews or findings that

17  may be relevant to the petitioned action"); 50 C.F.R. § 424.14(h)(1)(iii). Plaintiffs do not argue

18  that the Service was prohibited from considering its own prior rules, nor do they explain why the

19  petition finding was unreasonable given those prior determinations. *See Ctr. For Biological*

20  *Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1142 (D. Colo. 2004) (the Service need not

21  "blindly accept statements in petitions that constitute unscientific data or conclusions,

22  information [it] knows to be obsolete or unsupported conclusions of petitioners"; the Service

23  "can rely on what is within its own expertise and records to reject petitions consistent with ESA

24  standards").

25         By contrast, the two recent petitions related to wolves in the Western U.S. did present

26  substantial new information that had not been considered by the Service. *See* 90-Day Finding

27  Petition Review Form at 9-10 (petition provided information on legislation enacted in Idaho and

28  Montana in 2021 that petitioners state will lead to "drastically reduced wolf populations" in those

States) (*available at* www.fws.gov/mountain-prairie/es/species/mammals/wolf/westernpetitions/90-day-finding-petition-review-form-gray-wolf.pdf). Because the petition presented substantial information indicating that the new legislation "has the potential to increase take of wolves in both Idaho and Montana" and State regulatory mechanisms may be inadequate to address the threat of human-caused mortality, and because those two States "currently include approximately 75 percent of gray wolves that would be included in a Northern Rocky Mountains or Western DPS," the Service issued a positive 90-day finding and initiated a status review. *Id.* at 11; *see also* 86 Fed. Reg. at 51,859.[20]

If the Court nonetheless agrees with the *Defenders* plaintiffs that the Service applied an incorrect standard, the appropriate remedy is to remand the 90-day finding to the Service to allow it to issue a new finding. *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 112 (D.D.C. 2018); *see also* Pls. Reply at 29 (arguing for vacatur of the petition denial and remand to the Service).

**5.    If the Court rules in Plaintiffs' favor on claims challenging the delisting rule, the appropriate remedy is remand to the agency for reconsideration**

If Plaintiffs succeed on one or more of their claims challenging the delisting rule, the appropriate remedy would be for the Court to remand the rule to the Service for reconsideration. Fed. Defs. Br. at 27; *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907-08 (2020) (if agency's stated grounds are inadequate, court may remand for the agency to "offer 'a fuller explanation of the agency's reasoning *at the time of the agency action*'" or "'deal with the problem afresh' by taking new agency action") (emphasis in original) (citations omitted). Reconsideration by the agency is particularly appropriate here because, as

---

[20] The 2018 petition did not seek relisting of the NRM DPS. AR_326; *see also* AR_2786 ("The Northern Rocky Mountains DPS would continue to exist as defined by its present boundaries....").

1    explained above, the Service is already undertaking a status review of the wolves that are the

2    focus of much of Plaintiffs' argument—those in the Western U.S. *See* Pls. Reply at 13-18, 23-25.

3          Plaintiffs fail to grapple with what the appropriate remedy should be if the Court grants

4    summary judgment in their favor. In their reply, Plaintiffs advocate for "[r]einstating federal

5    protections for wolves during remand," without specifying what that means or how it could be

6    accomplished. Pls. Reply at 30. For example, the Defenders plaintiffs ask the Court to

7    "[r]einstate FWS's prior rule affording ESA protections for gray wolves in the lower-48 states."

8    *Defenders* Complaint, ECF No. 1, at 24 (Case No. 21-344). There is no single rule affording

9    ESA protections for gray wolves throughout the lower 48 States. In fact, when the Service issued

10   the November 2020 rule, wolves were only listed in Minnesota and 44 States. AR_42.

11         If the Service issued a rule correcting its regulations to reinstate the protections for the

12   gray wolf that existed in November 2020, it would not be listing the 1978 entities that Plaintiffs

13   argue qualify as "species."[21] Pls. Reply at 8 ("[T]he *1978 listings* 'meet the statutory definition

14   of a species' under 50 C.F.R. § 424.11(e)(3)") (emphasis added). Even if the Service agreed with

15   Plaintiffs' view—which it does not, *see* Section A., *supra*—the agency could not restore the

16   1978 listings because the endangered 48-State entity was modified through lawful actions that

17   are not challenged here. AR_41 (listing prior rulemakings, court orders, and congressional action

18   that modified 1978 entities); *see also* AR_39-40; *Ctr. for Biological Diversity v. Salazar*, No.

19   CV10-2130-PHX-DGC, 2012 WL 78943, at *3 (D. Ariz. Jan. 11, 2012) ("Plaintiffs ask the

20   Court to do more than return the desert eagle to the status quo . . .  Plaintiffs would have the

21   Court return the desert eagle to the protected status it had prior to the 2007 delisting rule when

22

23   ───────────────────

24   [21] If the Court vacates the 2020 Rule, the prior regulatory regime does not automatically spring
     back to life. Rather, the Service will have to take some regulatory action to implement or
     effectuate the Court's order. *See, e.g.*, 74 Fed. Reg. 47,483 (Sept. 16, 2009) (correcting gray wolf
25   listing in regulations to "reinstate the listing of gray wolves in all of Wisconsin and Michigan,
     the eastern half of North Dakota and South Dakota, the northern half of Iowa, the northern
26   portions of Illinois and Indiana, and the northwestern portion of Ohio as endangered, and
     reinstate the listing of wolves in Minnesota as threatened"); 75 Fed. Reg. 65,574 (Oct. 26, 2010)
27   (correcting the gray wolf listing for certain NRM wolf populations in response to a court order).

28

1  bald eagles, in general, were listed as threatened. That status is no longer possible because bald

2  eagles are no longer listed as threatened and no one has challenged the 2007 delisting rule.").

3          Plaintiffs' argument that partial vacatur is not an available remedy, Pls. Reply at 29-32, is

4  unconvincing. Plaintiffs incorrectly equate vacating a rule in part with an affirmative action by

5  the Court "relist[ing] only some subset of wolves in certain states." *Id.* at 31. Vacatur and

6  injunctive relief are distinct remedies, as Plaintiffs themselves acknowledge in their requests for

7  relief. [22] And the Supreme Court has held that if a "less drastic remedy," such as partial or

8  complete vacatur of the agency's decision, redresses a plaintiff's injury, then a court should not

9  resort to "the additional and extraordinary relief of an injunction." *Monsanto Co. v. Geertson*

10  *Seed Farms*, 561 U.S. 139, 165-66 (2010); *see also N. Plains Res. Council v. U.S. Army Corps of*

11  *Engrs.*, 460 F. Supp. 3d 1030, 1037 (D. Mont. 2020) (district court has "broad latitude" in

12  fashioning equitable remedy and "may exercise that discretion where appropriate to order partial,

13  rather than complete, vacatur"). If the Court identifies a violation that did not affect the entire

14  analysis, the Court should remand for reconsideration of that issue and vacate only that portion

15  of the rule or—accepting for the sake of argument Plaintiffs' view that partial vacatur is not an

16  available remedy—it should remand without vacatur. *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405

17  ("when equity demands, the regulation can be left in place while the agency follows the

18  necessary procedures"); *see also Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 929-30 (9th Cir.

19  2020) (remanding without vacatur where agency's error was not "serious"); *Ctr. for Biological*

---

20  [22] *See* ECF No. 1 at 33 (Case No. 21-561) (asking the Court to "[i]Issue injunctive relief as
21  necessary to prevent the implementation of the Rule"); ECF No. 79 at 64 (Case No. 21-349)
    (asking the Court to issue "any interim or permanent injunctive relief or other relief this Court
22  deems necessary, just, or proper or that Plaintiffs may subsequently request").

23    To the extent Plaintiffs seek injunctive relief, any such relief must be narrowly tailored to
    address the specific flaws identified in the agency's analysis. *See Nat'l Wildlife Fed'n v. Nat'l*
24  *Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018) ("There must be a 'sufficient causal
    connection' between the alleged irreparable harm and the activity to be enjoined.") (citation
25  omitted). For example, if the Court were to identify a flaw in the analysis with respect to West
    Coast wolves, but not Great Lakes wolves, Plaintiffs likely could not demonstrate a "'reasonably
26  certain threat of imminent harm to a protected species [that] is sufficient for issuance of an
    injunction'" requiring the Service to relist Great Lakes wolves. *Ctr. for Biological Diversity v.*
27  *Salazar*, 2012 WL 78943, at *3 (quoting *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th
    Cir. 1996)).
28

1   *Diversity v. Salazar*, 2012 WL 78943, at *8 (declining to vacate delisting rule pending the

2   outcome of a new 12-month finding because plaintiffs did not show that the desert eagle was

3   "likely to suffer irreparable harm . . . absent ESA protections during the remand period").

4         Whether to vacate the 2020 Rule involves factors that cannot be fully considered until the

5   parties know what deficiencies, if any, the Court finds in the final rule. *See Nat'l Fam. Farm*

6   *Coal. v. EPA*, 960 F.3d 1120, 1144-45 (9th Cir. 2020) (court must "'weigh the seriousness of the

7   agency's errors against the disruptive consequences of an interim change that may itself be

8   changed,'" "consider the extent to which either vacating or leaving the decision in place would

9   risk environmental harm," and evaluate "whether the agency would likely be able to offer better

10  reasoning or whether by complying with procedural rules, it could adopt the same rule on

11  remand") (citations omitted). Thus, Federal Defendants request the opportunity for further

12  briefing on remedy if the Court rules for Plaintiffs on any of their claims.

13  **V.      CONCLUSION**

14        Gray wolves are part of this Nation's identity, and the Service's multi-decade effort to

15  restore, conserve, and protect gray wolves—in collaboration with numerous partners—brought

16  them to the point of biological recovery. Because of this recovery, the Service embarked on

17  rulemaking to address the status of gray wolves throughout the lower 48 United States in 2019.

18  The Service rationally concluded that rulemaking with the 2020 Rule by finding the listed

19  entities are not protectable entities and, in any event, are biologically recovered. The Service has

20  appropriately responded to changing circumstances for gray wolves and continues to apply the

21  law and its expertise to protect them. The Court therefore should grant Federal Defendants'

22  motion for summary judgment and dismiss the related cases with prejudice.

23

24

25  DATED: October 8, 2021              TODD KIM, Assistant Attorney General
                                        SETH M. BARSKY, Section Chief
26                                      MEREDITH L. FLAX, Assistant Section Chief

27                                      */s/ Michael R. Eitel*
                                        MICHAEL R. EITEL, Senior Trial Attorney
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace 370
Denver, Colorado 80202
Phone: (303) 844-1479 / Fax: (303) 844-1375
Email: Michael.Eitel@usdoj.gov

OF COUNSEL:

KRISTEN BYRNES FLOOM
U.S. Department of the Interior
Office of the Solicitor

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al., | |
| Plaintiffs, | Case No. 4:21-cv-00344-JSW |
| v. | 4:21-cv-00349-JSW |
| U.S. FISH AND WILDLIFE SERVICE, et al., | 4:21-cv-00561-JSW |
| Defendants. | |
| WILDEARTH GUARDIANS, et al., | **CERTIFICATE OF SERVICE** |
| Plaintiffs, | |
| v. | |
| DEBRA HAALAND, U.S. SECRETARY OF THE INTERIOR, et al., | |
| Defendants. | |
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | Date:  November 12, 2021 Time: 9:00 AM Courtroom: 5 Judge: Hon. Jeffrey S. White |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | |
| Defendants. | |

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

/s/ Michael R. Eitel
MICHAEL R. EITEL